| | | |
|---|---|---|
| LYNA STRONG | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-cv-2847 |
| | § | |
| RAYMOND PARADISE AND | § | |
| GREYHOUND LINES, INC. | § | |

## <u>APPENDIX IN SUPPORT OF<br>DEFENDANT GREYHOUND LINES, INC.'S MOTION TO EXCLUDE OR<br>LIMIT THE TESTIMONY OF PLAINTIFF'S TRANSPORTATION SAFETY<br>EXPERT THOMAS J. CARRIGAN</u>

| **Exhibit Description** | | **Appendix Page(s)** |
|---|---|---|
| A | Expert Report of Thomas J. Carrigan | APPX. 001-029 |
| B | Deposition Excerpts of Thomas J. Carrigan | APPX. 030-050 |
| C | Official Traffic Collision Report | APPX. 051-057 |

# EXHIBIT "A"

# Crash Litigation and Safety Specialists, LLC

Crash Reconstruction and Transportation Safety Consulting
P.O. Box 746
Huntingdon Valley, PA  19006-0746
(215) 787-8850 (phone)
(215) 491-1920 (fax)

_____

Incident Reconstruction Report

in the matter of

# Lyna Strong v. Raymond Paradise & Greyhound Lines, Inc.

*(U.S. District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:23-CV-02847-K)*

for

Jessica Murray, Esquire
Witherite Law Group
10440 N. Central Expressway
Suite 400
Dallas, TX  75231

Prepared by:  Thomas J. Carrigan
ACTAR Board Certified Crash Reconstructionist #436
National Safety Council Defensive Driving Instructor #1073992 (retired)
Pennsylvania Third Party Examiner of Commercial Drivers #C-137 (retired)
Transportation Safety Specialist
February 28, 2025

CLASS File Number:  TJC 24.1015

CARRIGAN APPX. 001

At your request, I have prepared a summation report outlining my investigation and analyses to date with regard to the captioned matter. This writing summarizes my findings as of this time and highlights conclusions that have been reached and opinions that are held. These opinions are based on my qualifications, knowledge, training, and professional experience in the specialized areas of transportation safety, defensive driving, and crash reconstruction. Each of my opinions are expressed within a reasonable degree of professional certainty.

I have reviewed and considered the following information in preparation for writing this report:

1. Plaintiff's Original Petition

2. Plaintiff's First Amended Complaint

3. Defendants' Answer to First Amended Complaint

4. Plaintiff's Initial Disclosures

5. Defendants' Initial Disclosures

6. Plaintiff's Response to Interrogatories

7. Defendants' Response to Interrogatories, Request for Admission, and Request for Production

8. Deposition Transcript of Raymond Paradise (taken on 1/21/25 - draft copy)

9. 3-Ring Binder Documents (000001-000845)

    a. 000001 – Oklahoma Traffic Collision Report

    b. 000008 – Paradise Citizenship Evidence

    c. 000011 – Strong Citizenship Evidence

    d. 000018 – Greyhound Citizenship Evidence

    e. 000021 – Greyhound Declarations Page

    f. 000024 – 11 Point Collision Report

    g. 000028 – Damage Photographs

    h. 000034 – Damage Repair Estimate

    i. 000035 – Damage Repair Request

    j. 000036 – GLI Driver's Rule Book

    k. 000070 – Job Description - Professional MCO Candidate

l.  000076 – R. Paradise Drivers Qualification File

m.  000164 – MC-1515 Certificates of Authoriy

n.  000452 – Greyhound dashcam video segment (interior rear-facing view)

o.  000453 – Greyhound dashcam video segment (exterior forward-facing view)

p.  000454 – Form 6 – Notice of Personnel Record Entry for R. Paradise

q.  000456 – Form C4s – Passenger Information Cards / Witness Statements

r.  000475 – AIG Declarations Page

s.  000476 – Driver Operations & Safety Management Onboarding Documents

t.  000496 – TX Cab Card

u.  000497 – Bus Title

v.  000498 – Maintenance and Service Records

w.  000531 – Work Order Detail

x.  000641 – Operations Manager Onboarding Checklist

y.  000662 – Customer Experience Manager Checklist

z.  000683 – New Supervisor Checklist

aa.  000703 – Additional Vetting

bb.  000710 – Benefits / Payroll Information

cc.  000717 – Pre-Hire Docs

dd.  000744 – Complaints / Violations

ee.  000770 – Policy Bulletin Acknowledgment

ff.  000780 – Training Coursework Certificates

gg.  000845 – Accident Investigation

10.  Filevine Shared Document Folder (000875-003018)

a.  000875 – FMCSA Annual Vehicle Safety Inspection – Bus #86247

b.  000876 - Prevost X3-45 Operations Manual

 c. 001101 - Plaintiff's Independent Medical Evaluation

 d. 001103 – Estimate of Repair (GLI 86247)

 e. 001104 – R. Paradise Personnel & Driver Qualification File documents

 f. 001121 – GLI Driver's Rule Book

 g. 002033 – FMCSA Crash Report Detail

 h. 002034 – R. Paradise Hours-of-Service Post-Crash Log Listing

 i. 002041 – R. Paradise Drug & Alcohol Clearinghouse Queries

 j. 002055 – Purchased Bus Tickets by L. Strong

 k. 002089 – Michelin On-0Call Service Order Detail

 l. 002112 – GLI Driver Hiring Manual

 m. 002151 – R. Paradise Payroll Records

 n. 002152 – R. Paradise Employee File

 o. 002449 – Lytx / DriveCam System Upgrade Notice

 p. 002450 – Professional Motorcoach Operator Job Description

 q. 002455 - Lytx Hours-of_Service Detail

 r. 002456 – Lytx Hours-of_Service Listing

 s. 002457 – Lytx Hours-of-Service Violation Report

 t. 002458 – Lytx DVIR Listing for R. Paradise

 u. 002459 – Prevost X3-45 Order Specification

 v. 002496 – Request for Legal Hold – Bus #86247

 w. 002498 – Pre & Post-Trip Inspection Detail for Bus #86247

 x. 003018 – Volvo D13H Operator's Manual – Driver's Handbook

11. GLI Protective Order Documents

 a. 001155 - Phase 1 Driver Training Guide

 b. 001267 - Phase 2 Driver Training Guide

   c. 001454 - Driver Training School Student Guide Appendices

   d. 001653 - "Go / No Go" Risk Assessment Training

   e. 001655 - Following Distance and Adverse Weather Training Material

   f. 001680 - Back Safety – Injury Prevention

   g. 001698 - "Yes I Can" Customer Experience Training

   h. 001714 - Listing of 21 Training Modules

   i. 001715 - GLI Safety Policy Manual

   j. 002469 - GLI Driver's Payroll Guide

12. USB Flash drive containing audio/video attachments and FMCSA & MCMIS records

   a. Safety Profiles, Crash Reports, Inspection Reports, Carrier Authorities

13. Google Earth/Google Maps printouts of driver's route and breakdown/crash area

14. Vehicle Specifications for the Prevost Car X3-45 Motorcoach

15. Greyhound Driver Theodore Ratchford's pre-trip and post-trip inbound inspection reports for bus #86247, dated 5/1/22 at 10:25 AM and 10:14 PM, respectively

16. Federal Motor Carrier Safety Regulations, 49 CFR Part 392 - "Stopped Commercial Motor Vehicles", Section 392.22 – Emergency Signals

17. Federal Motor Carrier Safety Regulations, 49 CFR Part 393 - "Emergency Equipment", Section 393.95 – Emergency Equipment on all Power Units

18. Federal Motor Carrier Safety Regulations, 49 CFR Part 396 – "Inspection, Repair, and Maintenance", Section 396.7 – Unsafe Operations Forbidden

19. Federal Highway Administration, Office of Motor Carriers, "Model Curriculum for Training Motorcoach Drivers", Instructor's Guide, December 1994

20. Federal Motor Carrier Safety Administration, Department of Transportation Regulations, "Guide to Vehicle Accident Preventability and Countermeasures", copyright 2006

21. Missouri Commercial Driver License Manual, Section 2.5.2 – "Communicating Your Presence", August 2023

22. National Surface Transportation Safety Center for Excellence, Virginia Tech Transportation Institute, Report #18-UR-063, "Moth Effect – Determining Contributing Factors", by Travis Terry, January 2018

23. "Is the Moth Effect Real", by Marc Green, Ph.D, Human Factors and Science, July 2013

24. "Fatal Attraction: The Moth Effect Endangers Motorists & Police", by Karen M. Harris, 2012

25. "Traffic – Why we Drive the way we do", by Tom Vanderbilt, August 2009

26. Defendant Greyhound Lines' Confidentiality Agreement and Protective Order

I will reserve the right to supplement or modify this report as additional information is provided.

## BACKGROUND

According to the <u>Oklahoma Traffic Collision Report for case number 22-008568, prepared by Highway Patrol Officer Kendric Davis, Badge Number 319,</u> this loss took place in the early morning hours on Monday, May 2, 2022 at 2:20 AM central time. The location of the crash is indicated to be at mile marker 156.4 eastbound on I-44 / Turner Turnpike, which is situated within the city limits of Wellston, TX, Lincoln County. The posted speed limit in that area of I-44 is listed as 75 miles per hour. The roadway alignment and character is listed as straight and level, respectively. The weather conditions are reported to have been rain. The road surface conditions are listed as wet. Visibility in that area is indicated to have been unobscurred. The travelway is listed as a two-way divided highway with an eleven (11) foot improved shoulder on the south side of the eastbound travel lanes.

In the moments preceding this crash, defendant's 57 year old driver, Raymond Paradise, had parked his Greyhound bus on the south shoulder of I-44 due to alleged mechanical issues (i.e., "engine starting to overheat"). The shoulder width at that location is indicated to have been 11 ft. Mr. Paradise was operating a scheduled through route line-run trip between Oklahoma City and St. Louis, MO. The schedule originated in Los Angeles, CA and terminated in New York, NY, with driver change-overs along the route.

The bus remained parked on the shoulder awaiting the arrival of a vendor who was bringing anti-freeze to fill the coolant reservoir. During that time, 18 year old defendant Landon Richmond was approaching the area and traveling in the right of two eastbound operating lanes of I-44. Mr. Richmond was reportedly operating a silver 2004 Nissan Titan pick-up truck.

The police collision report describes the incident in its remarks section as follows:

> "Unit 1 (Mr. Richmond's Nissan pick-up truck) was traveling eastbound on I-44 / Turner Turnpike. Unit 2 (Greyhound bus) was parked on the shoulder of Turner Turnpike eastbound. While traveling east, Unit 1 (Nissan pick-up truck) departed the roadway right and collided with Unit 2 (parked Greyhound bus). AOI (area of impact) was approximately 2 ft south of the south edge of Turner Turnpike eastbound and approximately 0.4 of a mile east of mile marker 156. Unit 1 (Nissan pick-up truck) then continued east and came to rest in a ditch approximately 492 ft east and approximately 86 ft south of the AOI (area of impact).
>
> The driver of Unit 1 (Mr. Richmond) stated he fell asleep behind the wheel, causing him to depart the roadway and lose control of his vehicle. It was later determined that the driver of Unit 1 (Landon Richmond) was driving under the influence of alcohol. At which point he was placed under arrest".

Mr. Richmond's blood alcohol content was determined by way of a breath test and is indicated to have been .08%. He was arrested and cited for violation of Oklahoma statute number 47.11-902 (operation under the influence of alcohol). He was also cited for Oklahoma statute number 47.11-309 (driving on roadways lined for traffic), which stipulates that drivers must operate in a single lane only. Mr. Paradise was not cited for any type of traffic violation. The report indicates "no improper action by driver".

The police report further indicates Mr. Richmond (driver of the Nissan pick-up truck) was not wearing any type of occupant protection device at the time of the crash. Mr. Paradise (Greyhound driver) was reported to have been wearing a shoulder and lap belt assembly.

Mr. Richmond's pickup truck was towed from the scene due to disabling damage. The Greyhound bus was operational and driven from the scene by its driver, Raymond Paradise.

There are twenty eight (28) names listed on the police report as passengers onboard the Greyhound bus at the time of the crash. Plaintiff Lyna Strong is one of the names listed.

## SYNOPSIS OF PERTINENT MATERIAL

### Greyhound dashcam video segment (interior rear-facing view; 51 seconds duration)

Note: There is no 24-hour clock or timestamp indicated on this video segment.

Start   The bus is parked on the paved shoulder of the two-lane divided roadway and facing east; the interior lights inside the bus appear to be illuminated; it is dark outside the bus; the driver (Mr. Paradise) is seated in the driver's seat and appears to be wearing tinted glasses; he is also wearing a yellow reflective vest; he is focused on his cell phone which he's holding in his hands; all of the passengers appear to be seated and not visible within the aisle of the bus; it is quiet inside the bus; headlights and outlines of vehicles traveling east on I-44 are visible through the driver's side window and windshield as they pass by the parked bus.

00.13   A tractor trailer traveling east in the left inside lane passes the bus and begins changing lanes to the right; the bus appears to rock slightly from side to side; the driver (Mr. Paradise) is still focused on his cell phone.

00:18   A loud impact-type sound is heard, apparently emanating from the left rear side of the bus; Mr. Paradise yells "whoo"; a male passenger is observed being jostled out of his seat into the center aisle, several rows behind the driver's compartment. Mild commotion, well short of hysteria, is apparent.

00:23   Mr. Paradise looks out the windshield and mutters "What the hell?"; passengers appear to be rustling in their seats.

00:32   Mr. Paradise leaves his seat, stands and faces the passenger compartment, and asks "Everybody alright?"; he then continues standing along the center aisle and facing the exit door.

00:36   Another eastbound tractor trailer traveling in the left inside lane passes the bus and begins changing lanes to the right.

00:39   Mr. Paradise bends forward and looks out the right-side windshield in the direction of the pickup truck that had come to rest in a roadside ditch to the southeast of the bus' location.

00:41   Mr. Paradise appears to start texting or searching on his cell phone and continues doing so through the end of the video segment.

00:51   end of video segment.

## Greyhound dashcam video segment (exterior forward-facing view; 51 seconds duration)

Note: There is no 24-hour clock or timestamp indicated on this video segment.

| | |
|---|---|
| Start | Mr. Paradise's reflection is visible in the front windshield; he is seated in the driver's seat and looking downward; the bus is parked on the paved shoulder of the two-lane divided roadway; it is dark outside the bus; the vehicle's headlights appear to be illuminated; traffic is observed traveling westbound and approaching from the opposite direction; it is quiet inside the bus. |
| 00:13 | A tractor trailer traveling eastbound in the left inside lane passes the bus and begins changing lanes to the right with its right turn signal activated; Mr. Paradise appears to be still focused on his cell phone; |
| 00:18 | A loud impact-type sound is heard, apparently emanating from the rear left side of the bus; Mr. Paradise yells "whoo"; Mr. Richmond's pick-up truck is then observed passing the bus on the driver's side at a high rate of speed with sparks flying from its right-side wheels; the pick-up truck leaves the pavement on the south side of the highway and travels out-of-control u grassy incline while sparks continue to fly from its right-side wheels; the pickup truck then travels downgrade and disappears out of view; the pickup truck did not appear to flip over, but rather rolled to a stop on its wheels. |
| 00:23 | Mr. Paradise looks out the windshield and mutters "What the hell?"; |
| 00:32 | Mr. Paradise leaves his seat and asks "Everybody alright?" |
| 00:36 | Another eastbound tractor trailer passes the bus while traveling within the left inside lane of I-44 east; the truck then activates its right turn signals and changes lanes to the outside/right lane of I-44. |
| 00:51 | end of video segment. |

## Plaintiff's Answers to Defendant's First Set of Interrogatories

1. The eastbound bus left the Oklahoma City bus terminal approximately two hours late due to its late arrival from the west. Someone at the terminal (assumed to be a Greyhound supervisor) allegedly told her the inbound driver reported mechanical issues which caused his delayed arrival.
2. After departure, the bus was heading toward Tulsa, OK.
3. The bus started to experience mechanical problems as soon as it entered the turnpike (I-44). The driver (Raymond Paradise) called Greyhound on his cell phone and told them "I'm having the same issues".
4. The dispatcher allegedly told the driver to pull over to the shoulder. The driver did so but did not exit the bus to place warning devices.

5. Plaintiff and several other passengers allegedly asked the driver multiple times to move the bus to a safer location since they felt uncomfortable being parked on the shoulder of the highway.
6. Plaintiff finally laid down in her seat to rest and was doing so when the pickup truck struck the bus. The impact caused her to be thrown out of her seat onto the floor.
7. Her face struck the floor, chipping her tooth. She also received injuries to her knee, shoulder, and neck.
8. Plaintiff is a commercial vehicle transporter who picks up and delivers Class B commercial vehicles all over the country. She holds a Class B Commercial Driver's license and is familiar with the Federal Regulations applicable to vehicles such as Greyhound buses (e.g., 49 CFR 392.22 – Placement of Warning Devices; 49 CFR 393.95 – Emergency Equipment Requirements; 49 CFR 396.7 – Unsafe Operations Forbidden).

## Defendant Greyhound's Responses to Plaintiff's First Set of Interrogatories, Requests for Admissions, and Request for Production

1. Greyhound issues company owned cell phones to all of its drivers for communications purposes.
2. This was a standard scheduled through route line run and not a charter.
3. Greyhound does not know which dispatcher assigned the trip to Mr. Paradise.
4. Greyhound does not know what instructions (if any) were given to Mr. Paradise.
5. Mr. Paradise was not subjected to post-accident drug and alcohol testing.
6. Mr. Paradise submitted 11 passenger information cards (often referred to as "loading slips, witness slips, or C-4 reports") following this incident. There were 28 passenger names listed on the police report.
7. Mr. Paradise did not receive any type of disciplinary action, counseling, or re-training following this incident since the police report indicates "No Improper Action by Driver". They further contend that their driver did not cause or contribute to this crash. He was simply stationary and waiting on the shoulder for a vendor to arrive and add anti-freeze to the leaking coolant system. For that reason, Greyhound's "Notice of Personnel Record Entry" states "Not at fault. Safety Record not charged".
8. Greyhound denies that this crash was caused by their driver's or the company's negligence.
9. Greyhound utilizes the services of HireRight to screen driver applicants and conduct the federally mandated pre-employment background checks.
10. Greyhound denies utilizing any company other than HireRight (e.g., First Advantage) to pre-screen driver applicants and conduct background investigations.
11. The dashcam video segments that were produced by Greyhound were captured by Lytx DriveCam Technology equipment.
12. Greyhound was unable to locate or produce any type of pre-trip inspection documentation submitted by Mr. Paradise prior to his departure from Oklahoma City.

## Report of Collision submitted by Raymond Paradise

1. The time of incident is indicated as 02:00 (2:20 AM according to police report).
2. The bus number is indicated as 86 (actually 86247).
3. The schedule number is indicated as 1358 – Oklahoma City to St. Louis, MO.
4. The hire date is indicated as 4/29/22.
5. The driver's home terminal is indicated as St. Louis, MO.

6. The driver's estimated hours of driving for the entire trip or portion of trip since last period of 8 consecutive hours off duty sections are left blank.
7. The bus damage section is left blank.
8. The roadway, paving, weather, and light conditions are checked off as being straight and dry, asphalt, clear, and dark, respectively.
9. Information regarding vehicle 2 (i.e., pickup truck driver's name and address, owner's name and address, year/make/model of vehicle, final status, etc.) are left blank.
10. Number of persons on bus at time of crash (including the driver) is indicated as 45 (police report indicates 29).
11. The "Description of Collision" section reads as follows:
    a. 2:00 AM Bus Schedule 1358 was parked on the shoulder of highway 44 east headed to Tulsa, OK.
    b. Bus was in need of service and was waiting on a vendor for anti-freeze.
    c. The bus was struck on the driver rear side by a pickup truck (white) that flipped over off the highway.
    d. Bus operator called 911 for help and checked passengers for injury.
    e. No passengers reported injuries of any kind and waited for the police.
    f. Trooper Kendric Davis arrived about 30 minutes later to check on truck which had 1 passenger and 2 animals.
    g. The male was placed in the police car after EMS checked him out.
    h. Trooper Davis escorted the bus to a gas station in Wellston as a safe place to wait for a tow.
    i. A tow truck arrived at 6AM, followed by a bus from Wichita, KS that took us back to "MVA Statials" (? - Illegible).
    j. The report is dated 05/02/22 and signed by Mr. Paradise and supervisor Barbara Boyd.
    k. The eyewitness and bus occupants sections are both left blank.

## Greyhound's 11 Point Collision Report

1. According to the 11 Point Report, Mr. Paradise's call into the control center to report the crash was not received until 11:19 AM central standard time on 05/02/22 (approximately 9 hours following the collision).
2. The call taker at Greyhound's Control Center is listed as Esteban Naverro.
3. Mr. Paradise's seniority date is listed as 10/16/17.
4. The CDL expiration date question is left blank.
5. **Mr. Paradise's available hours-of-service remaining are indicated to be 1.00 hour on his driving time, 10.25 hours on his on-duty-not driving time, and 35.50 hours on his 8-day total time, which indicates he had insufficient driving time remaining to complete the entire trip to St. Louis legally).**
6. The date and time of collision is indicated as 05/02/22 at 02:00 eastern standard time (police report indicates 2:20 AM).
7. The bus number is listed as 86247.
8. The year/make/model of the bus is listed as 2014 Prevost, model X3-45.
9. The schedule number for this trip between Oklahoma City and St. Louis, MO is listed as 1358, Section 1 – Regular.
10. The number of passengers onboard the bus at the time of the crash is indicated to have been 45 (police report indicates 29).

11. C-4 reports (i.e., "loading slips/witness slips") were collected by Mr. Paradise (only 11 submitted).
12. The Description section reads as follows:
    a. Operator R. Paradise was on the side of road for a maintenance issue in which he contacted maintenance response.
    b. While waiting for a vendor, a white pickup truck made contact with the back of the bus towards the driver side, causing the truck to flip over and careen off the road into a ditch.
    c. No injuries were reported by either the passengers or drivers.
    d. The adverse driver was arrested on scene.
13. The road condition is listed as wet. The weather conditions are listed as clear.
14. Information regarding the striking vehicle (e.g., driver's name and address, year/make/model of vehicle) is left blank.
15. The description of damage for the pickup truck is listed as "Unknown – turned over missing a wheel" (no indication that it turned over).

**Deposition Transcript of Raymond Paradise (draft copy)**

1. He is currently employed by Greyhound Lines as a motorcoach operator. He began his employment at Greyhound in April 2018. He hasn't returned to work as a driver for Greyhound since the May 2, 2022 crash.
2. He believes the weight of the Greyhound bus he was driving at the time of this crash was approximately 1000 lbs. (actually 39,468 lbs/19.7 tons empty; 53,000 lbs/26.5 tons fully loaded).
3. He agrees that a professional driver practices safety at all times by never taking risks that would endanger themselves, their passengers, or others.
4. He agrees that commercial vehicle operators are required to know and do more than a non-commercial driver.
5. He agrees that the Federal Government requires commercial drivers to do certain things before starting a trip.
6. He agrees that one of those things is a pre-trip inspection of the vehicle.
7. He agrees that pre-trip inspections are important so that drivers can identify deficiencies in order to make certain they can properly maintain the vehicle throughout the entire trip (i.e., safely complete the trip).
8. He agrees that if deficiencies are noted during the pre trip inspection, he must first notify the Company in Dallas regarding the defect; then have the defect addressed and corrected; next, if the defect is unable to be corrected, notify the Company in Dallas and request a bus change if another is available.
9. He was taught by Greyhound to do a pre trip inspection prior to each departure.
10. Greyhound drivers no longer record pre-trip inspections manually; rather, they are recorded digitally via an application stored on the driver's company issued cell phone, then transmitted, retrieved, and maintained by Greyhound.
11. He has no knowledge about how the digital system works; if a record is not available for review, that does not mean the pre trip inspection wasn't conducted by the driver.
12. He believes he had a company issued cell phone in his possession at the time of his pre-trip inspection in Oklahoma City on May 2, 2022.
13. He has no knowledge about not being issued a company cell phone until May 10, 2022. He believes their buses can't be operated without the company issued phone.

14. He does not know why Greyhound has no record of the pre trip inspection that he conducted prior to his departure from the Oklahoma City terminal.
15. He believes the company issued cell phones don't always link properly to the bus, resulting in the company (i.e., Greyhound MRD / Maintenance Response Desk in Dallas) not being able to track the driver or the bus.
16. He doesn't recall having any problems linking his cell phone to his bus prior to his departure from Oklahoma City.
17. He agrees that commercial vehicle operators are required to operate their vehicles safely, understand the rules and regulations of the road, and maintain a safe environment both on and off the vehicle; they must also communicate with passengers in a professional manner.
18. He agrees that commercial vehicle operators are required to know the proper use of safety systems on their vehicles, including identifying symptoms of improper operations revealed through instrumentation, as well as diagnosing malfunctions.
19. He agrees that commercial vehicle operators must have knowledge of the correct procedures needed to use those safety systems in an emergency situation.
20. He explained that Greyhound's digital pre-trip and post-trip inspections require him to notate, or at least say "yay" or "nay" whether or not each particular item is functioning properly. If a driver selects "yay", the system allows him to move on to the next item; if they select "nay", they're unable to complete the pre or post-trip inspection until that particular item has been diagnosed, addressed, and corrected.
21. His responsibilities when making an emergency stop (including situations that call for pulling off to the side of the road), are to make certain you put your vehicle in the safest spot that you can; that your bus remains visible to oncoming traffic through the use of your 4-way flashers; and to make certain your passengers are safe.
22. He contends there are a number of belts and hoses in the engine compartment that need to be inspected during the pre-trip inspection, as well as oil and coolant fluid levels; primarily, this process includes checking for leaking fluids.
23. Checking the coolant level during a pre-trip inspection is important for safe operation of the engine because low fluid levels will shut the vehicle down; Greyhound's pre trip inspection includes checking for proper fluid levels as well as ensuring that all belts and hoses are in proper working order with no signs of leaks.
24. He is not familiar with regeneration procedures; MRD normally walks a driver through that process when needed.
25. He customarily checks the coolant level during his pre-trip inspections, but does not fill any of the fluids himself; filling fluids is a mechanic's responsibility.
26. He was diagnosed with non-insulin-dependent diabetes mellitus in June of 2018. It is being treated with Metformin and Lisinopril which are oral medications
27. To his knowledge, he has never been diagnosed with a respiratory disorder.
28. There was an incident in February 2019 where a terminal manager in Denver told him to remove his CPAP breathing machine from the front seat of the bus and place it in the baggage compartment, which he refused to do.
29. He was diagnosed with sleep apnea around that time and has used the CPAP machine nightly since then through today's date.
30. Greyhound sent him for a sleep study following his CDL physical exam and became aware of his sleep apnea condition once the results were received.
31. He believes he may have had a clinical diagnosis of high blood pressure / essential hypertension in the past.

*Lyna Strong v. Raymond Paradise & Greyhound Lines, Inc.*

*U.S. District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:23-cv-02847-K*
CLASS File No. TJC 24.1015
February 28, 2025
Page 15 of 29

32. As of the time of this crash on May 2, 2022, he had never had a medical history / clinical diagnosis of a mental, nervous, organic, functional, or psychiatric disorder.

33. According to a medical examination form signed by Dr. Chopra, he was diagnosed with amnesia on June 14, 2018. However, he doesn't recall ever being diagnosed with that condition, doesn't recall ever having problems with his memory, and doesn't remember what amnesia is.

34. Bates label 2362 regarding that visit with Dr. Chopra states "the patient is here for a neurological consultation; he is presenting to the clinic with a chief complaint of amnesia and right knee / lower back / hip pain; he also discussed high blood pressure, diabetes, and occasional episodes of being angry and upset; his wife states she is noticing forgetfulness and behavior changes; the patient complains of memory loss".

35. He does not recall telling Dr. Chopra that he was experiencing memory loss.

36. He suffered head trauma and was diagnosed with a concussion in May 2018 after being involved in a motor vehicle crash. His Rivermead post-concussion score was 60. He recalls the crash but doesn't recall being diagnosed with a concussion.

37. He doesn't have any knowledge of of having memory issues at the time of the crash on May 2, 2022.

38. He was required to take a road test and written test prior to be assigned his first assignment in 2018 at his original time of hire with Greyhound in Las Vegas.

39. The training provided by Greyhound was thorough and complete at the time of his original hire in March 2018; it included instruction regarding pre-trip inspections; he was issued an Entry Level Training Certificate on March 23, 2018.

40. Greyhound makes certain that most of their drivers are made aware of policy or procedural changes as they're made.

41. Greyhound taught him that if he was tired, he had the option of calling off; and that "most times if I'm too tired to drive I call off".

42. One of the motto's that appears on company documents is "If it isn't safe, don't do it"; to him, that means if it's something that could put someone/anyone in danger, then you don't want to do it.

43. He agrees that it is the driver's responsibility to determine if the motorcoach is safe for operation.

44. As a professional commercial driver, he believes he was taught to always have a plan, and that it's important to be on the lookout for hazards in every situation.

45. One of the hazards he is aware of regarding nighttime driving is your vision is cut in half which affects spotting obstacles, pedestrians, and wildlife.

46. One of the hazards associated with driving a commercial vehicle when the coolant level is low is the bus can run hot, and if not attended to, can stop.

47. As a driver, when he sees that the coolant level is low, he is supposed to call MRD and inform them of the situation; MRD will have him do an inspection of the situation and report his findings; MRD will then make a decision to either troubleshoot the situation or give instructions to shut the vehicle down completely.

48. On the night of the incident, the inbound driver who brought the bus into Oklahoma City reported the bus to be "a good bus"; following that, he conducted his pre-trip inspection and found that all of the instrumentation and fluid levels indicated it was safe to drive; he eventually departed the Oklahoma City terminal and was destined to St. Louis, MO.

49. If there is ever a situation where he doesn't know what to do, he would ask a local supervisor, call a supervisor in Dallas, check with another driver, look into the Federal Motor Carrier Safety Regulations, or look into the Greyhound Rule Book.

*Lyna Strong v. Raymond Paradise & Greyhound Lines, Inc.*

*U.S. District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:23-cv-02847-K*
CLASS File No. TJC 24.1015
February 28, 2025
Page 16 of 29

50. He is familiar with the Federal Motor Carrier Safety Regulations and agrees that they apply to him as a commercial vehicle operator as well as to Greyhound who is the company that hired him.

51. He agrees that the Federal Regulations are the minimum requirements applicable to commercial drivers; he also agrees that Greyhound has the right to establish more rigorous and stringent safety rules if they choose to do so.

52. He is certain that it is his responsibility as a commercial driver to comply with the Federal Motor Carrier Safety Regulations.

53. He agrees that Greyhound can't instruct a driver to ignore certain parts of the Federal Regulations.

54. He agrees that a commercial driver would needlessly endanger his passengers and the public if a. he drives a commercial vehicle that's not properly maintained; b. he drives a commercial vehicle without being satisfied that the vehicle is in safe operating condition; c. he skips his pre-trip inspection; d. he operates a commercial vehicle in a condition that may cause an accident or breakdown.

55. He agrees that a driver needs to ensure that emergency equipment is in place, ready to use, and to take note of its location.

56. He has no complaints or problems with the rule regarding section 392.8 of the Federal Motor Carrier Safety Regulations, which reads "No commercial motor vehicle shall be driven unless the driver thereof is satisfied that the emergency equipment required by section 393.95 of this subchapter is in place and ready for use; nor shall any driver fail to use or make use of such equipment when and as needed". However, he does <u>not</u> believe he is bound by this section because "That's beyond my pay grade".

57. He has operated Greyhound busses without having safety equipment on board.

58. He believes he received training at Greyhound regarding the requirement to place warning devices within 10 minutes of stopping on the side of the road. He acknowledged a March 15, 2018 training record that included topics such as emergency procedures and placement of warning devices which included his name and signature as one of the attendees.

59. He agrees that he did not place emergency triangles on the shoulder of the road after parking his bus on the shoulder prior to this crash, the reasons being he was parked far enough off the highway that other vehicles would not strike it; the interior lights on the bus were illuminated; his 4-way flasher lights were activated and working properly; he was communicating simultaneously via two telephones with St. Louis and Dallas; the safety of his 50 passengers was his top priority; to jump off the bus, go underneath, and try to locate the warning devices which may or may not be there is a lot of things to do at the same time.

60. He understands that part of his pre-trip inspection includes checking for the location and number of emergency warning devices, but passenger baggage often moves around in the baggage compartments and may block access to the emergency equipment; sometimes you may have to take every bag off the bus to find and retrieve them; however, he is sure the emergency equipment was located somewhere within the baggage compartment.

61. He "possibly" agrees that his re-hire date at Greyhound was April 29, 2022.

62. He doesn't recall exactly what documentation he was given by Greyhound at the time of his re-hire in April 2022, but knows it wasn't as much as he was given in 2018 when he was originally hired.

63. He doesn't recall receiving comprehensive training from Greyhound during the re-hire process in April 2022, such as he received at the time of his original hire in 2018; however, he is certain he was given a refresher on driving in April 2022 (refresher documentation is dated 5/12/22).

64. He had two cell phones in his possession during his short trip on May 1-2, 2022; one was a company issued I-Phone and the other was his personal I-Phone; he doesn't recall the number of his company issued phone.

65. He believes he had to sign a form when he was issued his company issued I-Phone, but he isn't certain about that; he believes it may have been Barbara Boyd, his terminal manager, who gave him his cell phone in April 2022.

66. He wasn't using either phone at any time during his short trip on May 1-2, 2022; he didn't use either of the phones until the bus broke down.

67. Hours of service record keeping was documented on the company issued I-Phone and uploaded to Greyhound.

68. He believes he was able to search for prior mechanical issues for a particular bus via an application on his company issued cell phone.

69. He receives his dispatch assignments from the control center in Dallas, TX.

70. He wasn't given and didn't need a route guide for the trip he was assigned to on May 1-2, 2022 between Oklahoma City and St. Louis; he was familiar with the stops along the route to service customers since he had operated it "too many times" prior to this trip; he estimates he had operated that route more than 10 times at night.

71. He doesn't know how many exits there are or where they may be located on I-44 East/Turner Turnpike between where he entered the highway and where he broke down; only those who know the area intimately would know where all the exits are located; he's familiar with the route but doesn't know the area intimately; he only knows where the exits are to service customers; the only thing he's familiar with is where the next stop would be to actually service customers, which would be Tulsa, OK. (Note: the Wellston/Route 66 exit was located approximately 1.4 miles east of the breakdown location).

72. He agrees that if the bus could make it to an exit ramp or a gas station, these would be safer places to park the bus than the shoulder of a highway.

73. He again reiterated that he performed a pre-trip inspection of the bus and inspected each of the items listed on the application's M-7 checklist prior to departing the Oklahoma City terminal on May 1, 2022 (checking for fluid leaks is not one of the items included on that checklist).

74. He states that he doesn't have access to the information contained on the previous driver's post-trip inspection report unless the bus is taken out of service; that information resides on the previous driver's phone; only if the bus is taken out of service would it show up on his phone; he would then have to call MRD regarding its status and what to do.

75. He verbally spoke with the previous driver who told him there were no problems with the bus, after which he conducted his own pre-trip inspection and found no issues of concern or defects; there were no indications of any type of malfunction at that time.

76. The only indication he received that suggested a malfunction was when he lost the ability to accelerate the bus and the engine died out; he was then unable to move forward.

77. There was no mechanic on site at the Oklahoma City terminal prior to his departure; there has never been a mechanic assigned or available at the Oklahoma City terminal.

78. He determined the bus was safe to be on the roadway following his pre-trip inspection.

79. He doesn't remember what indications he may have received on the control panel immediately preceding the bus's loss of acceleration; he guesses that the air pressure buzzer was probably buzzing loudly, and that the speedometer was indicating a loss of speed; he doesn't remember the sequence of events regarding when the signal first became audible, when he started losing speed, and when he lost acceleration completely.

80. Once he started losing speed and the ability to accelerate, he pulled over to the shoulder of the highway because he was on an incline and he knew he wouldn't make it to the top of that incline; he didn't pass by any exits on I-44 East while the air pressure signal was buzzing.

81. He has no idea how much time elapsed between when he stopped on the shoulder and when he was struck by the pickup truck; he was too busy to keep track of time.

82. All he remembers about the impact was he heard a thud, and then the pickup sort of glided off the roadway into the bushes; it wasn't a scary situation to him; it is his belief that most of the passengers had no idea the bus was struck by a pickup (doubtful based on video).

83. He doesn't remember where he was at the time of impact; he may have been at the front of the bus or he may have been in the middle.

84. To his knowledge, he wasn't working for any other transportation company during the time in May 2022 when he was working for Greyhound.

85. He isn't sure, but guesses his schedule was due out of Oklahoma City around 9:00 PM or a little after.

86. Plaintiff's bus ticket indicates a scheduled departure time of 8:50 PM; he doesn't remember whether he departed on-time or late and has no indication regarding what time he actually departed.

87. Exhibit 5 is the pre-trip and post-trip inspection reports file; there is an accounting of Bus #86247 on May 1, 2022 and indicates the post-trip inspection by the previous driver (Theodore Ratchford) was conducted at 10:14 PM; he agrees that he wouldn't have been able to get online and complete his pre-trip inspection prior to Mr. Ford's completion of his post-trip and sign-off.

88. He has no knowledge about why the bus was running late that night; he claims the east-west through schedules into Oklahoma City normally run late.

89. Exhibit 28 – Michelin On Call 2.0 includes the notation "Greyhound, May 2, 2022, 1:30 AM" and another stating "Greyhound says the driver just called in and said it looks like a broken or loose hose clamp on the right side of the engine"; he agrees that a broken or loose hose clamp is obviously something he could have and would have seen during his pre-trip inspection.

90. Also included on that document is a notation at 1:50 AM on May 2, 2022 indicating "Reply from driver – okay", and another SMS notation 3 minutes later at 1:53 AM letting them know which mile marker he was located at; Michelin then reached out to him to see if anyone had gotten out to him yet; he responded "No" at 3:21 AM; he doesn't recall communicating via text with Michelin that night.

91. Based on these times (i.e., 1:30 AM and 3:21 AM), the bus was broken down on the shoulder for at least 1 hour and 51 minutes at that point; he agrees that the Federal Regulations require him to place warning devices within 10 minutes of stopping on a highway shoulder, but contends he was unable to do that because of all the other things he had to trend to.

92. He doesn't remember if he ever saw the low coolant level indicator light illuminated on the control panel that night; he doesn't recall the color of the low coolant indicator light, but thinks it may have been yellow or red; he doesn't recall telling anyone that he observed the low coolant level indicator light being illuminated.

93. He did not make a call to Michelin on Call personally; he called MRD in Dallas; he believes it must have been MRD in Dallas who spoke to Michelin that night.

94. Despite the listing of violations, complaints, and vehicle crashes listed on pages 20 and 21 of this report, he doesn't remember ever being disciplined by Greyhound with regard to his driving performance.

**Greyhound's Driver Rule Book**

1. Rule 5-2, page 19 - <u>Pre-Trip and Post-Trip Inspections</u> states the following:
   a. Drivers must complete a thorough pre-trip and post-trip inspection of his or her bus according to existing policy. Drivers must make sure there is sufficient light to see all aspects of the bus, including the tires and other equipment, in order to properly perform the inspection.
   b. A driver terminating at a remote or non-garage location with a bus that has mechanical issues that might prevent further operation of the bus must complete the M-7 and contact MRD to advise the company of all equipment issues.
2. Rule 5-4, page 19 – <u>Driver's Responsibility</u> states the following:
   a. Professional Greyhound drivers must drive in such a manner as to ensure the safe operation of the bus and take reasonable action to identify accident-producing situations soon enough to avoid a collision.
3. Rule 5-5, page 20 – <u>In Case of a Collision</u> states the following:
   a. Whenever involved in a collision as defined below, drivers are required to: a. stop at a safe place if the bus can be moved; b. assist passengers and others involved in the collision; c. protect the scene with flags/reflectors; d. report the collision to the Company and police, and; e. obtain all required information. Notification to the Company shall be in a manner prescribed by the company.
   b. Drivers shall immediately report all collisions involving the operation of a bus which result in death, injury, or any type of damage, regardless of the extent of injury or damage or who was responsible, in the manner prescribed by the company.
   c. Drivers must attempt to have a Loading Slip (Form C-4) made out by each passenger on any bus involved in any collision, thermal event, injury to a passenger or third party, or incident involving passengers or third parties. Drivers are required to have an adequate supply of Loading Slips in their possession while on duty.
4. Rule 5-7, page 21 – <u>In Case of Breakdown</u> states the following:
   a. Drivers should follow procedures for breakdowns as prescribed by the Company. If circumstances require, and it is safe to do so, the driver may use discretion in allowing passengers to exit the bus.
5. Rule 5-12, page 22 – <u>Bus Parking</u> states the following:
   a. Drivers must properly park their bus in a designated safe, legal place according to Greyhound policy.
6. Rule 5-15, page 22 – <u>Speed</u> states the following:
   a. Busses are not to be operated in excess of the posted speed limit. Regardless of the governed setting on the bus or posted speeds that exceed 70 mph, the bus should never be operated in excess of 70 mph. It will be the driver's responsibility to maintain the bus's speed on downhill grades in accordance with these guidelines.
   b. Under no circumstances is a bus to be driven at a speed greater than is reasonable and prudent under the existing weather, road, and traffic conditions.
7. Rule 5-26, page 25 – <u>Safety Training Compliance</u> states the following:
   a. Drivers are responsible for knowing all safe driving practices and safety policies/procedures that have been communicated to them in training courses, refresher courses, bulletins or directives, safety meetings, or in any other way safety

information is given to drivers by the Company. The safety rules and procedures that are included in this Driver's Rule Book are not to be considered the only policies, procedures, and practices that drivers must use in the safe operation of their buses.

## Greyhound's Job Description – Professional Motorcoach Operator

Verbiage contained in this document that is considered to be applicable to this case is as follows:

1. You are required to complete detailed records such as passenger counts, driver logs, and safety records (i.e., pre-trip inspection reports; post-trip inspection reports; incident reports; accident reports).
2. You are required to maintain a good driving record with no more than two (2) moving convictions/preventable accidents in the past three (3) years, or no more than three (3) moving convictions/preventable accidents in the past five (5) years.
3. A Driver Operator drives the motorcoach safely with or without passengers on board while adhering to traffic laws and D.O.T. regulations.
4. A Driver Operator conducts a comprehensive pre-trip inspection and post-trip inspection of the motorcoach to ensure safe operating conditions.
5. A Driver Operator obtains and reviews the inspection book from the motorcoach before operation and visually inspects the inside and outside of the motorcoach and brake system following a checklist (M-7 checklist on the I-Phone application does not contain an item relative to checking for fluid leaks).
6. A Driver Operator documents mechanical malfunctions or other motorcoach problems on the proper form and verbally notifies the mechanic of mechanical malfunctions.
7. A Driver Operator receives notification from the mechanic of action to take and determines if the motorcoach is safe for operation.
8. Greyhound Lines, Inc. provides world class training to launch your career as a professional motorcoach operator at a significant cost to Greyhound. On average, training takes five to six weeks.
9. Mr. Paradise had been previously employed by Greyhound as a motorcoach operator. He resigned from the company in November 2021. He re-applied for the position of motorcoach operator on 4/26/22 (6 days prior to this incident). He completed some of the required pre-employment paperwork and was assigned his first trip on 4/29/22 (3 days prior to this incident). The incident in the early morning hours of 5/2/22 occurred on his second trip after returning to active duty. He completed the remaining and required pre-employment paperwork on 5/4/22.

## Greyhound's Maintenance Service Records and Work Order Details – Bus #86247

1. On 4/27/22, the cooling system was repaired in Los Angeles, CA (details unknown)
2. On 5/1/22, the inbound driver to Oklahoma City on schedule 1358-1 (this incident) reported no defects or mechanical issues on his post-trip M-7 report.
3. On 5/1/22, the outbound driver (i.e., Raymond Paradise) from Oklahoma City on schedule 1358-1 (this incident) experienced a road failure in the late evening hours when "the low coolant light came on and the system started to overheat".
4. On 5/1/22, work order #1035511 was opened at 23:32:41 (11:32 PM) which was several hours prior to this crash at 2:20 AM on 5/2/22; this is assumed to be Mr. Paradise's initial call to Greyhound's maintenance center in Dallas (MRD) after parking on the shoulder of the highway;

the reason noted is "Road Failure / Road Call / Cooling System"; the vehicle was subsequently towed to Dallas, TX for repair; the work order opening time of 23:32:41 suggests a departure time from the Oklahoma City terminal at some time around 10:50 PM on 5/1/22; the work order indicates a completion date and time of 02:55:20 on 5/2/22 (approximately 35 minutes following this crash); the closed date is indicated as 05/16/22.

5. On 5/2/22, the cooling system was repaired in Dallas, TX. The only noted defect was documented as a "broken clamp".

6. Aside from the above-mentioned mechanical issues, there are numerous and recurring emission/exhaust system "failure to regenerate" occurrences noted in the file that dates back to 1/14/22 and continues through 4/27/22 in Los Angeles, which was six days prior to this incident. There is also indication that the cooling system was repaired in Los Angeles, CA on 4/27/22, shortly before schedule number 1358-1 departed on its cross-country trip destined to New York City. The bus then experienced a cooling system malfunction four days later at the time of this incident.

## Vehicle Specifications - Prevost Car X3-45 Motorcoach (pertinent to this incident)

1. Length: 45 feet (13.72 meters)
2. Width: 8.5 feet (2.59 meters)
3. Height: 11.1 feet (3.40 meters)
4. Gross Vehicle Weight Rating: 53,000 pounds (26.5 tons – fully loaded)
5. Wet weight: 39,468 pounds (19.7 tons - fluids only; no passengers or baggage)

## Federal Motor Carrier Safety Administration's "Guide to Vehicle Accident Preventability and Countermeasures (copyright 2006)

1. Crashes resulting from being struck by another vehicle while parked are considered to be NON-PREVENTABLE if the struck vehicle was legally and properly parked where parking is permitted, in accordance with Section 392.22 of the Federal Motor Carrier Safety Regulations.
2. Crashes involving mechanical defects are considered to be PREVENTABLE if the defect was of a type that the driver should have detected during pre-trip or enroute inspections of the vehicle.
3. Crashes involving mechanical defects are considered to be PREVENTABLE if the defect was of a type that the driver should have detected during es'normal operation of the vehicle.
4. All types of crashes are considered to be PREVENTABLE if the driver was in violation of company operating rules or special instructions, the regulations of any Federal or State agency, or any applicable traffic laws or ordinances.

## Federal Motor Carrier Safety Regulations, 49 CFR Part 392 – Driving of Commercial Motor Vehicles, Subpart C – Stopped Commercial Motor Vehicles, Section 392.22 – Emergency Signals

(a) Hazard Warning Signal Flashers: Whenever a commercial motor vehicle is stopped upon the traveled portion of a highway or the shoulder of a highway for any cause other than necessary traffic stops, the driver of the stopped commercial motor vehicle shall immediately activate the vehicle's hazard warning signal flashers and continue the flashing until the driver places the warning devices required by paragraph (b) of this section. The flashing signals shall also be used during the the time the warning devices are picked up for storage before movement of the commercial motor vehicle. The flashing lights may be used at other times while the commercial

motor vehicle is stopped in addition to, <u>but not in lieu of</u>, the warning devices required by paragraph (b) of this section.

(b,2,v) <u>Placement of Warning Devices on Divided or One-Way Roads:</u> If a commercial motor vehicle is stopped upon the traveled portion or shoulder of a divided or one-way highway, the driver shall place the warning devices as soon as possible, but in any event within 10 minutes, as follows: one warning device at a distance of 200 feet and one warning device at a distance of 100 feet in a direction toward approaching traffic, in the center of the lane or shoulder occupied by the commercial motor vehicle. He/she shall also place one warning device at the traffic side of the commercial motor vehicle, within 10 feet of the rear of the commercial motor vehicle.

**Federal Motor Carrier Safety Regulations, 49 CFR Part 396 – "Inspection, Repair, and Maintenance", Section 396.7 – Unsafe Operations Forbidden**

a) A motor vehicle shall not be operated in such a condition as to likely cause an accident or a breakdown of the vehicle.

**Missouri Commercial Driver License Manual, August 2023, Section 2.5.2 – "Communicating Your Presence"**

a) Other drivers may not notice your vehicle, even when it's in plain sight. To help prevent accidents, let them know you're there.

b) When you pull off the road and stop, be sure to turn on the four-way emergency flashers. This is important at night. Don't trust the taillights to give warning. Drivers have crashed into the rear of parked vehicles because they thought the vehicle was moving normally (e.g., moth effect). If you must stop on the road or the shoulder of any road, you must put out your emergency warning devices within 10 minutes of stopping. If traveling on divided or one-way roads, place your warning devices behind the bus at the following locations: 10 ft, 100 ft, and 200 ft in the direction of approaching traffic.

**Federal Highway Administration, Office of Motor Carriers, "Model Curriculum for Training motorcoach Drivers", Instructor's Guide, pages 6-5 through 6-25, December 1994**

a) When your coach breaks down, you must find a safe place to park, turn on your four-way flashers, secure the coach from moving, and display the reflective triangle reflectors.

b) Avoid parking on the shoulder if at all possible. Try to find a rest area, parking lot, or other location well off the roadway.

c) Turn on your four-way flashers as soon as you are in the lane from which you will be exiting the roadway. Leave them on as you bring the coach to a stop. The.D.O.T. requires that the four-way flashers continue flashing until the driver places the emergency warning devices.

d) Once the coach is stopped, set the parking brake, place the transmission in neutral or park, and shut off the engine. If you are carrying a block, place it under one of the wheels. If you do not have a block, look around for a rock big enough to block a wheel.

e) Placing warning devices must be done whenever you park on the travel portion of a highway or on the shoulder. These warning devices must be placed within 10 minutes of stopping.

f) On a divided highway or one-way road, place all three reflective triangles behind the coach in the direction of approaching traffic. Place one triangle 10 feet behind the coach, another 100 feet behind the coach, and the third 200 feet behind the coach. This will give approaching traffic plenty of warning so they can avoid your disabled vehicle.

## Mr. Paradise's Violations of Greyhound's Standards of Performance

Company records indicate the following violations and remedial actions taken to prevent recurrence:

05/20/18: Motor vehicle crash (details unknown)
01/25/19: Blocked off ADA seats with a personal item (i.e., breathing machine) (Source: terminal supervisor) – counseled
03/09/19: Speeding 74/55 (Source: Drive Cam - DOT Serious Violation)  - counseled
03/21/19: Speeding 77/55 (Source: Drive Cam - DOT Serious Violation) – counseled
04/08/19: Speeding 77/55 (Source: Drive Cam Tracking Report) - DOT Serious Violation) – 1-day refresher (documentation not provided) and counseled
04/09/19: Motor vehicle crash (details unknown)
05/15/19: Complaint by passenger; wandering in and out of lane for 40 miles, onto shoulder and into opposing lane of travel; driver claims he was fatigued (Source: phone call from passenger) - counseled
11/30/19: Hours of Service violation (Source: supervisor - details unknown) - counseled
12/04/19: Left agency early, stranded passengers (Source: commissioned agency) - counseled
01/17/20: Blocked off front seats with his personal belongings (Source: supervisor) – counseled
01/17/20: following too closely at 1 second interval (Source: Drive Cam) - counseled
06/02/20: Speeding 78/65 (Source: unknown)- counseled
08/02/20: Speeding 69/55 (Source: Drive Cam Tracking Report) - counseled
10/20/20: Speeding 71/60 (Source: Drive Cam) - counseled
02/27/21: Speeding 68/55 (Source: Drive Cam) – refresher training (documentation not provided) and counseled
03/04/21: Speeding 72/60 (Source: Drive Cam) - counseled
09/14/21: Speeding 75/60 (Source: Drive Cam - DOT Serious Violation) - counseled

## Pre and Post-Trip Inspection Reports for Bus #86247 by Previous Driver Theodore Ratchford

1. The date and time of the pre-trip inspection is 5/1/22 at 10:25 AM.
2. The date and time of the post-trip inspection in Oklahoma City is 5/1/22 at 10:14 PM.
3. There are no defects noted on either report.
4. Checking for fluid leaks is not listed as an inspection item on either of his reports.

DISCUSSION

Impact avoidance has been defined as the ability of a driver to take preventive action (e.g., parking in a safer location, placing warning devices as required) in the moments before a collision with an object or person becomes inevitable. Proper interpretation and prompt reaction to potential hazards often influence the likelihood of collision avoidance. Collisions occur largely due to a degradation of some sort in the driver's ability to take such evasive measures. Such a loss of ability can often be attributed to errors in driving / operating strategy and/or driving / operating tactics.

**Mr. Paradise's strategy was based on his belief that he had no time to place warning devices as required by Federal regulations.**

Driving strategy deals with the decision's drivers make and actions that they take, prior to perceiving a hazard, that influence their opportunities to avoid a collision through the execution of successful evasive tactics. It involves the general perception of a vehicle/road/traffic situation, an appraisal of possible hazards or risks, and adjustments of speed and position on the road to minimize the risk. Strategy involves recognizing general situations in terms of the probability of a hazard appearing, as well as the consideration of the physical environment and capabilities of the driver/vehicle unit to cope with them.

**Mr. Paradise failed to understand that the bus' presence on the shoulder of the highway in the middle of the night during inclement weather within City limits created a significant potential hazard, and that placing warning devices would help minimize the risk.**

As a result of proper strategic decisions, a driver continuously chooses to do things that will place him or her in a more advantageous position should evasive tactics become necessary. Lacking appropriate appraisal of the situation, however, drivers often decide on actions which place them in less advantageous positions, or simply make no decisions at all.

**Mr. Paradise's decision to not place warning devices was not only a violation of Federal regulations; it also compromised the safety of his passengers, his bus, and himself.**

Defensive drivers are taught to search for and respond to potential hazards before they become actual hazards that require emergency response.

**Mr. Paradise failed to do so.**

Driving tactics, on the other hand, relate to the evasive actions taken by a driver to evade or escape from an actual hazard once it has been perceived. Typical evasive maneuvers commonly involve some degree of braking and/or steering. The initiation of an evasive tactic involves a sequence of three distinct phases, a process which the National Safety Council refers to as the *Collision Prevention Formula:*

1. Recognize - perception/recognition of the hazard.
2. Understand - deciding how to avoid the hazard.
3. Act - performing the chosen evasive measure in sufficient time to avoid a collision.

**Mr. Paradise either failed to recognize the potential hazard, or ignored the potential hazard; he also failed to comprehend its implications and the adverse affect his actions would have in terms of passenger safety.**

Performance often fails in this process due to failure to perceive, delays in perception, failure to assess and comprehend possible implications, and/or prolonged reaction. In addition, various situation hazards (e.g., physical or mental distractions, multi-tasking, sensory overload, illness, fatigue) often play a significant role in crash causation, especially when a driver fails to recognize such conditions as adverse to the driving task. When this occurs, they often fail to respond with appropriate adjustments in speed and/or positions relative to other traffic units or objects.

**Mr. Paradise failed to sort out what his priorities were while dealing with all of the things he claims he was dealing with. His first step should have been to properly secure the coach to minimize the risk to his passengers, which would have included placing emergency warning devices as required by Federal regulations.**

The National Safety Council defines a preventable collision as one which results in any property damage and/or personal injury, regardless to what extent, in which a driver failed to exercise every reasonable precaution possible in order to avoid impact. The focus lies on one's interpretation of the word reasonable. This term has been otherwise described as "...possessed by sound judgment; logical; intelligent; wise; sane; sensible...". An example of a reasonable precaution specific to Mr. Paradise's situation (i.e., sitting stationary on the shoulder of a high-speed highway in the middle of the night during inclement weather within City limits) created the potential hazard of being struck by oncoming traffic whose driver(s) may be fatigued, impaired, distracted, succumbing to the moth effect, or otherwise compromised – and that such a situation called for the execution of each and every precaution possible that the driver could and should execute in order to prevent such a mishap from occurring. This is the essence of the previously mentioned *Collision Prevention Formula* offered by the National Safety Council.

**Mr. Paradise failed to take every possible action available to him in order to minimize the risk to his passengers.**

Professional drivers who operate passenger carrying commercial vehicles for compensation are taught and expected to follow the *Five Keys to Space Cushion Driving,* which are:

1. Aim high in steering.
2. Get the big picture.
3. Keep your eyes moving.
4. Leave yourself an out.
5. Make sure they see you.

Evidence suggests that Greyhound subscribes to and teaches these concepts to its drivers. When applied by an experienced, alert, and cautious defensive driver, the National Safety Council and Five Keys principles complement and support each other in a way that will assist them to not only prevent most vehicle collisions, but also reduce the likelihood of serious injuries.

**Mr. Paradise failed to adhere to numbers 2 and 5 of these important keys to defensive driving.**

CARRIGAN APPX. 025

Common Carriers of passengers are held to the highest duty of care as it relates to doing whatever is necessary to keep their passengers safe and free from harm. Warnings regarding progressive disciplinary measures to be taken for repeat offenses are noted on each infraction notice contained in Mr. Paradise's personnel file. However, progressive measures were not implemented by Greyhound following repeat offenses. The above-mentioned listing of Mr. Paradise's operating offenses includes multiple violations of Greyhound's demanding performance standards regarding speed, following distance, and the three 3-year / 5-year conviction rates, creating multiple opportunities for Greyhound to administer higher level progressive disciplinary measures than the customary "verbal counseling" in an effort to get Mr. Paradise's attention, correct any bad habits he may have developed through the years, and improve his performance. Although each of his offenses individually fall below the threshold and definition of a legal "conviction", they were either reported to a company supervisor or captured by Greyhound's Lytx dashcam technology and viewed/analyzed by Greyhound supervisors who were trained to recognize and address adverse driving behaviors.

**Greyhound's failure to implement more appropriate remedial measures no doubt contributed to Mr. Paradise's lackadaisical response to the situation he was presented with in the early morning hours of May 2, 2022.**

<u>CONCLUSIONS</u>

Based on all that I have reviewed, it is my opinion, within the limits of reasonable technical and analytical certainty in the areas of transportation safety and defensive driving, that Mr. Paradise could have and should have exercised every precaution he had available to him that may have prevented this event from taking place. Notwithstanding the failures of Mr. Richmond, this crash would not have occurred and could have been prevented had Raymond Paradise conducted and documented a more thorough pre-trip inspection of the vehicle as required by company and Federal regulations; had Raymond Paradise recognized the impending shutdown sooner by scanning his control panel more frequently during his trip and noting rising engine temperature and hot engine warning signals that no doubt illuminated some time before he lost the ability to accelerate; had Raymond Paradise made a decision to not proceed onto a limited access highway where he might become stranded and create a "sitting duck" scenario; and had he placed the required warning devices behind his vehicle as outlined within and required by Federal regulations. Based on the criteria outlined in the Federal Motor Carrier Safety Administration's "Guide to Vehicle Accident Preventability and Countermeasures', this crash was, to a reasonable degree of technical and analytical certainty in the areas of transportation safety and defensive driving, preventable.  At the time Raymond Paradise failed to perform the tasks as outline above, it was foreseeable to a reasonable bus driver in his position that such failure would lead to bus becoming stranded in an unsafe situation on the side of the highway. But for Raymond Paradise's failures and violations of the Federal Motor Carrier Safety Regulations, this collision would not have occurred.

Additionally, to a reasonable degree of technical and analytical certainty in the areas of transportation safety and defensive driving, Greyhound could have and should have spent more time on the vetting process at the time of Mr. Paradise's re-hire in April 2022. Some of the pre-hire documentation appears to be incomplete, missing, or not verified. A more thorough background investigation process would have eliminated these deficiencies and perhaps result in a decision to not rehire this applicant. At the time Greyhound failed to properly vet Raymond Paradise at the time of his rehire, it was foreseeable to a reasonable commercial motor carrier in Greyhound's position that such failure would lead to unsafe driving practices by its driver, including the specific acts or omissions Raymond Paradise committed at the time of the incident on May 2, 2022.  But for Raymond Paradise being re-hired by Greyhound in April 2022, this collision would not have occurred.

Additionally, to a reasonable degree of technical and analytical certainty in the areas of transportation safety and defensive driving, Greyhound failed to adequately address and thereby correct recurring maintenance issues regarding the emissions/exhaust system regeneration process that date back to 1/14/22 and continue through 4/27/22 in Los Angeles, as well as the cooling system issues that started in Los Angeles on 4/27/22 and continued to the time of this crash.  At the time Greyhound failed to maintain its commercial motor vehicle as required by applicable industry standards and regulations cited above,  it was foreseeable to a reasonable commercial motor carrier in Greyhound's position that such failure would lead to the bus becoming disabled and put its driver in a position of having to decide between competing unsafe options while transporting passengers on the night of May 2, 2022.   But for the failure of Greyhound in maintaining its commercial motor vehicle, this collision would not have occurred.

Finally, the specific failures of Greyhound and Raymond Paradise, within the limits of reasonable technical and analytical certainty in the areas of transportation safety and defensive driving, are:

1. Mr. Paradise failed to perform and document a thorough pre-trip inspection of bus number 86247 prior to his departure from Oklahoma City at approximately 10:50 PM on 5/1/22.
2. Mr. Paradise failed to make reasonable and proper observations while driving.
3. Mr. Paradise failed to be attentive to the driving task and maintain proper lookout relative to available instrumentation on his bus and related warning systems.
4. Mr. Paradise failed to place emergency warning devices along the shoulder of the road as required by Federal and State regulations.
5. Mr. Paradise failed to continue as far as he could toward the next exit located on I-44 eastbound at mile marker 157.8 prior to parking his bus on the shoulder of the highway at mile marker 156.4 since he originally stated "the engine started to overheat"; during his deposition he acknowledged knowing that engine shutdown doesn't occur instantaneously, but rather progresses to that stage if not addressed by the driver by stating "one of the hazards associated with driving a commercial vehicle when the coolant level is low is the bus can run hot, and if not attended to, can stop (see item 46 on page 13 of this report); he in fact was able to operate the bus and follow the police car to a safer location off the highway at Exit 158 (approximately 1.4 miles ahead of his stopped location), without having a vendor add additional coolant or make any repairs to the cooling system.
6. Mr. Paradise failed to walk to the back of the passenger compartment following the crash to check the status and condition of each of his passengers, as required by industry standards and Greyhound's expectations. He merely stood up at the front of the bus and asked "Everybody alright?"
7. Mr. Paradise failed to collect and submit C-4 "witness slips" from each of his passengers. The names of 28 passengers appear on the police report. Mr. Paradise indicated there were 45 passengers onboard on his Report of Collision, and that he had 50 passengers onboard during his deposition. He only submitted 11 slips which did not include the injured plaintiff.
8. Greyhound could have and should have spent more time on the vetting process at the time of Mr. Paradise's re-hire in April 2022.
9. Mr. Paradise appears to have had insufficient driving hours remaining to complete the trip to St. Louis legally, based on the information contained on Greyhound's 11-point Collision Report which indicates he only had 1 hour remaining to drive; the trip to St. Louis from the area of impact covered approximately 470 miles and required 6 hours - 50 minutes of driving time. In addition, he failed to report anything about his hours driven and hours remaining on his Report of Collision. Each of these notations suggest the possibility that he was headed toward another hours-of-service violation and was therefore operating the trip in violation of the Federal Hours-of Service regulations.
10. Greyhound chose not to charge Mr. Paradise's safety record with failing to conduct and document the required pre-trip inspection, as well as failing to place emergency warning devices as required. They base this decision on the fact that the police report indicates "no improper actions" on the part of Mr. Paradise

11. Greyhound failed to adequately address and ultimately correct recurring maintenance issues specific to bus number 86247 that were documented between January 2022 and the time of this crash.

CARRIGAN APPX. 028

12. Greyhound should update their I-Phone application that drivers use to document pre and post-trip inspections by adding an item relative to "checking for fluid leaks".

Each of these opinions are expressed within a reasonable degree of professional certainty.

By:     CRASH LITIGATION AND SAFETY SPECIALISTS, LLC

Thomas J. Carrigan
ACTAR Board Certified Crash Reconstructionist #436
National Safety Council Defensive Driving Instructor #1073992 (retired)
Pennsylvania Third Party Examiner of Commercial Drivers #C-137 (retired)
Transportation Safety Specialist

# EXHIBIT "B"

**In the Matter Of:**

STRONG vs RAYMOND PARADISE

3:23-CV-02847-K

# THOMAS J. CARRIGAN JR.

*May 29, 2025*



800.211.DEPO (3376)
EsquireSolutions.com

CARRIGAN APPX. 030

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LYNA STRONG                    )(
                               )(
        Plaintiff              )(
                               )(
VS.                            )(    CIVIL ACTION NO.
                               )(    3:23-CV-02847-K
RAYMOND PARADISE AND           )(
GREYHOUND LINES, INC.          )(
                               )(
        Defendants             )(
_____

ORAL AND VIDEOTAPED DEPOSITION OF
THOMAS J. CARRIGAN, JR.
MAY 29, 2025
(Reported Remotely)
_____


ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS J. CARRIGAN, JR., produced as a witness at the

instance of the DEFENDANT GREYHOUND LINES, INC., taken

in the above-styled and numbered cause on MAY 29, 2025,

between the hours of 2:01 P.M. and 5:42 P.M. Eastern

Standard Time, reported stenographically by

JODY McWHORTER, Certified Court Reporter No. 6095, in

and for the State of Texas, remotely via Zoom, in

Warrington, Pennsylvania, pursuant to the Federal Rules

of Civil Procedure and any provisions stated on the

record or attached therein.

 

APPEARANCES


COUNSEL FOR PLAINTIFF:

    JESSICA MURRAY  (via Zoom)
    WITHERITE LAW GROUP, PLLC
    10440 North Central Expressway, Suite 400
    Dallas, Texas  75231
    Jessica.murray@witheritelaw.com


COUNSEL FOR DEFENDANT RAYMOND PARADISE:

    DANIEL LYTLE  (via Zoom)
    HEPLER BROOM, LLC
    130 North Main Street
    Edwardsville, Illinois  62025
    Daniel.lytle@heplerbroom.com
    Par@heplerbroom.com


COUNSEL FOR DEFENDANT GREYHOUND LINES, INC.:

    JOHN P. MARTIN  (via Zoom)
    THE HAMM FIRM
    1333 West McDermott, Suite 200
    Allen, Texas  75013
    jmartin@hammfirm.com


ALSO PRESENT:

    DERRICK WARD, Videographer  (via Zoom)



                                INDEX

                                                              PAGE

Appearances ...................................    2

THOMAS J. CARRIGAN, JR.
Examination by Mr. Martin .......................    5
Examination by Mr. Lytle ........................   93
Examination by Ms. Murray .......................  132
Examination by Mr. Martin .......................  139
Examination by Mr. Lytle ........................  142

Reporter's Certificate ..........................  145

Attached to the end of the transcript:  Stipulations

                              EXHIBITS

NUMBER   DESCRIPTION                                        PAGE

   1     Extract from Plaintiff's Second
         Supplemental Disclosure of Expert
         Testimony ..............................   25

   2     Incident Reconstruction Report ..........   31

   3     Official Oklahoma Traffic Collision
         Report .................................   33



Greyhound driver, and the pickup truck was being operated by a male by the name of Landon Richmond, I believe.  And you've said this is not a memory quiz, but that's what I recall.

Q.  That's correct.  And what I'm talking about when I say the involved parties are the vehicles that were involved in the collision.  I understand there were passengers on the bus, but I'm not talking about the passengers right now, I'm just talking about the vehicles involved.

A.  Yes.

Q.  All right.  Mr. Richmond, what is the source of the information that you have about Mr. Richmond's involvement in this case?

A.  A police report.

Q.  All right.  Let me see if I can pull that up.

Mr. Carrigan, do you see the document that I have shared on my screen titled Official Oklahoma Traffic Collision Report?

A.  Yes.

Q.  All right.  And this document is beginning Bates label Greyhound 1 through 7, and I'll go ahead and have this marked as the next exhibit, 3, to this deposition.

(Deposition Exhibit No. 3 introduced)



Q.  Is this the police report that you reviewed in preparation of your opinion in this case?

A.  Yes.

Q.  All right.  And --

A.  It appears to be.

Q.  You testified to Mr. Raymond Paradise shown here as the operator of the Greyhound bus, correct?

A.  Yes.

Q.  And then also driver of the truck that you mentioned was Mr. Landon Richmond?

A.  Yes.

Q.  All right.  And I want to scroll down to Page 4.  Do you see the remarks to this report indicating that Unit 1 was traveling on Interstate 44, Unit 2 was parked on the shoulder of Turner Turnpike?

Do you see where I am?

A.  Yes.

Q.  All right.  And then it says:  While traveling, Unit 1 departed the roadway right and collided with Unit 2.

Do you see where I am?

A.  Yes.

Q.  And would you agree with me that Unit 1 refers to Mr. Landon Richmond's vehicle?

A.  Yes.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CARRIGAN APPX. 035

Q.   And Unit 2 refers to the Greyhound bus at issue in this case?

A.   Yes.

Q.   All right.  Scrolling down, highlighted, it says:  The driver of Unit 1 stated he fell asleep behind the wheel, which caused him to depart the roadway and lose control of his vehicle.

Do you see where I am?

A.   Yes.

Q.   And then it was later determined that the driver of Unit 1 was driving under the influence of alcohol and placed under arrest.

Do you see that?

A.   Yes.

Q.   And you said that this document was the source of information that you have about Mr. Richmond's involvement in this accident, correct?

A.   Yes.

Q.   All right.  Have you reviewed any other information regarding Mr. Richmond's acts or conduct that in any way would have influenced your opinion given in this case?

A.   No.

Q.   So you don't have and have not seen any documents regarding what Mr. Richmond either did or



Q. Okay. Did you perform any simulations or reconstructions of this accident as it pertains to what happened in this case?

A. No.

Q. Okay. The plaintiff has also designated a human factors expert, Mr. Rider. Are you familiar with Mr. Rider?

A. I've heard the name. I don't know the individual.

Q. Okay, fair enough. We'll get to that shortly.

A. And I heard the name not involved in this case. I didn't know that.

Q. Fair enough. So you didn't perform any simulations or reconstructions. Did you do any independent testing or inspection of what happened? Obviously you didn't visit the site, but did you perform anything of that nature in generating your opinions in this case?

A. No.

Q. You reviewed the documents that are reflected in your report and you provided your opinions based on those documents. Is that fair?

A. That's correct.

Q. Okay. We've talked about factually what happened in this accident, but I want to ask you, is



driving impaired.  Do you recall that?

A.  Yes.

Q.  Okay.  And to be clear, you don't have any independent evidence and have not seen any independent evidence of what Mr. Richmond's state of mind was, one way or the other, at the time his truck collided with this Greyhound bus, have you?

A.  I have no idea about his state of mind.

Q.  Exactly.  And I understand the concept of the moth effect, as you've described it, basically a moth is attracted to light, and I take it a human, as you have articulated it, theoretically may have some attraction to a light seen off the side of the road. Is that a fair interpretation?

A.  Yes.

Q.  Perhaps over-generalized, but a fair interpretation?

A.  Yes.

Q.  The moth effect is not something that has, I think you said, been proven scientifically; is that correct?

A.  That's -- to my knowledge, yes, that's correct.

Q.  Okay.  Because it appears to me that the inverse of that is lights certainly broadcast to oncoming traffic that there is an object on the side of



A.   On that specific bus, I do not.  That same incident happened to me one time when I was a driver on an MCI bus much older than this bus and -- where I noted that the temperature was starting to rise.  I drove the bus about six minutes and made it to a service station in the mountains of Pennsylvania.

So I don't know how this Prevost compares to that.  I would assume they do better these days than they did then, but then again, it would -- it would depend on the amount of coolant leakage.  So I -- I don't know the answer to that question.

Q.   Okay.  Fair to say, sir, and I appreciate your anecdotal experience with a different model bus, you simply have no information, whether it be documentary information, testing information, simulation information, or actual experience, with this model bus, the X3-45, to provide any opinions as to how it would behave in an overheating situation that would lead us to know how much time would occur between the bus beginning to get above operating temperature and any loss of power acceleration.  Fair statement?

A.   That's fair.

Q.   Okay.  And furthermore you have no testing information, simulation information, or anecdotal or specific experience with this bus to understand what



Mr. Paradise could have done in terms of operating the bus after he first noticed that there was an issue, in terms of could he have gone ten feet, ten miles, or anything; you can't -- you have no basis to provide that opinion, correct?

A. Well, what do you mean by first noticed? Do you mean when the needle starts to rise or do you mean when the engine shut down and he can't accelerate?

Q. Well, let's do this, sir. You have no information to tell us at any point how much time would have elapsed between the needle starting to rise and an engine failure in this bus, correct?

A. That's correct.

Q. Okay. So in this specific situation, let's just call it from the first moment that Mr. Paradise realized there was a problem, you cannot provide an opinion that he could have driven that bus on the lane of travel for any extended period of time beyond simply what he did, which was to pull the bus over, correct?

MS. MURRAY: Object to form.

A. Again, I don't know if the engine was shut down or the engine was running at the time that he did that.

Q. Okay.

A. I haven't been able to confirm that.

Q. Okay. So let's just do it this way, and I just



want to be clear on this one, yes or no.  After the first time Mr. Paradise was aware of any issue with that bus, you cannot provide an opinion that he could have driven that bus to, say, the next exit and pulled off the highway completely, correct?  You can't make that opinion or statement?

MS. MURRAY:  Object to form.

A.  Anecdotally, I would say if he started to see the needle rise, he would have made it another mile to the exit.  Do I know that for a fact, no.

Q.  Okay.  Nor have you done any testing on this bus, simulated this bus, or have any specific experience with this bus to give context to your anecdotal experience; would that be a fair statement?

A.  Correct, yes.

Q.  Okay.  All right.  Let's then go to -- with respect to number 4:  Mr. Paradise failed to place emergency warning devices along the shoulder of the road.

You're specifically talking about just the triangles, correct?

A.  Yes.

Q.  Okay.  And earlier you were asked what is your understanding of Mr. Paradise's testimony about the presence of triangles on the bus?



Q. Yes. You are not making any opinions that rely upon the moth effect --

A. No.

Q. -- in this case?

A. That's correct.

Q. Okay. To the extent that we've discussed this, it's more just anecdotal? We're just discussing the fact that it's a principle that's out there, but you're not relying on that in any way to make any opinions about the visibility of this bus as it relates to how it appeared on the night in question?

A. Yeah, that's beyond me.

Q. Okay. All right. And you're not making any specific opinions about -- from a human factors standpoint, about what a person would or would not be able -- what their response would be between seeing a four-way flasher versus a reflective triangle, correct?

A. That's correct.

Q. Okay, all right. Now, with respect to this driver, the driver who ultimately struck the vehicle, I know that Mr. Martin asked you about this and you said you do not know what his level of conscious was, correct?

A. I do not.

Q. Okay. And you talked about two different types



of kind of being asleep at the wheel, one being where your eyes are open but you're impaired, versus one where your eyes are closed.

You don't have any information one way or the other specifically Mr. -- let me get his name because I want to make sure I've got it correct.  Let's just call it the at fault driver of the pickup truck.

A.  Right.

Q.  You don't know --

MS. MURRAY:  Object to form.

Q.  Okay.  Well, do you know who I'm talking about when I say the driver of the pickup truck?

A.  Yes.

Q.  Okay.  You don't know what his level of consciousness was in those two different options that we discussed, asleep at the wheel but eyes are open versus eyes versus closed, correct?

A.  I do not.

Q.  Okay, all right.  You have no information what he saw or didn't see on the night in question?

A.  I do not.

Q.  Okay.  You have no information whether he actually saw the bus itself, the four-way flashers, or any other illumination from the bus in any way, correct?



A.  That's correct.

Q.  Okay.  You have no information that had there been a triangle out there that he would even be able to see it or acknowledge what it was based on his medical impairment status, correct?

A.  That's correct.

Q.  Okay.  So it's your opinion that Mr. Paradise failed to place a triangle, and that's in violation of the federal standards, correct?

A.  Yes.

Q.  Okay.  But you cannot state that the failure to place that triangle either caused or contributed to cause the accident in this case.  Is that a fair statement?

MS. MURRAY:  Object to form.

A.  Repeat that, please.

Q.  Okay.  I said you can tell us that he violated the federal standard by failing to place the triangle.

A.  Yes, that's correct.

Q.  And I understand that.  But you cannot say -- because we don't know the level of impairment of the driver, we don't know what he saw, we don't know how he would have reacted had he seen it, you cannot state that the failure by Mr. Paradise to place the triangles either caused or contributed to cause the accident in



this case?

MS. MURRAY: Object to form.

A. No. It made the accident preventable, is how I worded it in my -- in my report.

Q. If the driver didn't see the -- assume with me there were triangles and he did not have the ability to see them based on his own level of impairment, how would that have prevented the accident?

A. It wouldn't have. It would have just put him, Mr. Paradise, in compliance.

Q. Okay. So basically the preventability in your opinion is solely based on his failure to do it and the violation of the federal statute, correct?

A. Well, I'm citing from the Federal Motor Carrier Safety Administration's guide to vehicle accident preventability.

Q. And is that cited specifically in your report that I can follow along?

A. And this says --

Q. What page is that, sir?

A. No, I'm just reading you something out of that document.

All types of crashes are considered to be preventable if the driver was in violation of company operating rules or instructions -- which they were,



they were -- it was in violation of Greyhound's training -- or the regulations of any federal or state agency -- which there was a violation there of federal and the Missouri CDL training.

Q. Okay. So your opinion is --

A. And the Federal Highway's -- and the Federal Highway's model curriculum. It's a violation of all three of those.

Q. Okay.

A. Which makes it preventable.

Q. All right. Well, let's --

A. Meaning the Federal Highway Administration.

Q. Let's dial that down. So your opinion is it's preventable based solely on the violation and the language stated in those federal guidelines, correct?

A. It's preventable because my -- my specialty area is defensive driving.

Q. Okay.

A. Which involves the concept of preventability, and you need to ask yourself after a driver's been involved in an accident, did this driver do everything possible within reason to prevent this accident. If the answer is yes he did, then it's a nonpreventable incident. If the answer is no, he forgot to whatever, he forgot to look left, which is an accident that I'm



working on now, and got killed because he forgot to

look left, then that's preventable.

It's did the driver do everything within reason that he could have and should have done.  That in my mind makes this preventable.

Q.  Okay.

A.  Without even reading this Federal Motor Carrier Safety Administration stuff.

Q.  Okay.  Well, let's make a distinction between preventable and cause.

A.  They're different.

Q.  They are different.  You would agree with that?

A.  Yes.

Q.  Okay.  So it's your opinion that this accident was preventable based upon the guidelines and your testimony about Mr. Paradise didn't do everything you believe he could have done.  Fair?

A.  That's correct.

Q.  Okay.

A.  And that's -- and that's explained in my report.

Q.  Okay, all right.  And, see, now we're getting somewhere.  All right.  So that's what you're saying there.  So basically you're saying it was preventable, but because we don't know what the driver of the pickup

16:22 (throughout)



truck saw, didn't see, was aware of, was not aware of, or didn't have the ability to see one way or the other, you therefore can't say that the failure to place the triangles caused or contributed to cause the accident. It can be preventable, but you can't say that it either caused or contributed to cause the accident. Fair statement?

A. I can't say that with any degree of certainty.

Q. All right. Thank you, sir.

The last thing I just want to ask about is -- obviously, is passenger safety a concern for drivers?

A. Top concern.

Q. Okay, all right. And if a driver believes that he needs to make a decision that would -- well, strike.

So what you're saying is, every decision a driver makes, he needs to take the passenger's safety into consideration?

A. That's correct.

Q. Okay. What if by doing something that actually might be a requirement of a company or the federal motor carrier's safety guidelines, what if by doing that it would actually place passengers at risk? What is a driver to do in that situation?

A. I can't think of a situation where I know that



He had that option to make that decision. We can Monday morning quarterback it and say well, he would have never made it, you know. He had an option and I think he chose the most dangerous option of let me pull over and stop this bus and park here until I get help.

Q. You were asked earlier about whether you visited the site. Would visiting the site a few years after this wreck, would that change or affect your opinion at all?

A. I don't believe so. I printed a lot of maps from Google Earth that show -- clearly show the roadway, show the shoulder, show the -- show the incline. So I have a general idea without being there of the environment.

Q. And then the same thing as far as the fact that you did not do simulations, reconstructions, or inspections. Would those three things change your opinion at all in this case?

A. Number one, I don't -- I don't do simulations. I went to a course once, but I've never been involved in actually doing those things. So I -- I would turn down that assignment if I was asked to do it. I don't believe I'm qualified.

Q. Okay. Same thing with testing and inspections?

16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:35
16:36
16:36
16:36
16:36
16:36
16:36
16:36
16:36
16:36
16:36
16:36
16:36



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LYNA STRONG                          )(
                                     )(
          Plaintiff                  )(
                                     )(
VS.                                  )(     CIVIL ACTION NO.
                                     )(     3:23-CV-02847-K
RAYMOND PARADISE AND                 )(
GREYHOUND LINES, INC.                )(
                                     )(
          Defendants                 )(

REPORTER'S CERTIFICATE

I, JODY McWHORTER, Certified Court Reporter, certify that the witness, THOMAS J. CARRIGAN, JR., was duly sworn by me, and that the deposition transcript is a true and correct record of the testimony given by the witness on MAY 29, 2025, and that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

Pursuant to Federal Rule 30(5)(e)(2), a review of the transcript was not requested.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 6th day of June, 2025.

_____
JODY McWHORTER, Texas CSR 6095
Expiration Date:  07-31-25
Bryant & Stingley, Inc., CRN No. 41
PO Box 3420
Harlingen, Texas  78551
(956) 428-0755



# EXHIBIT "C"

# OFFICIAL OKLAHOMA TRAFFIC COLLISION REPORT

DO NOT WRITE IN THIS SPACE

|  | Y N |  | Y N |
|---|---|---|---|
| Incident Report | X |  |  |
| Investigation Completed | X | Revised | X |
| Investigation Made at Scene | X | Fatality | X |
| Photographs | X | Hit and Run | X |

**(1) Reporting Agency:** OKLAHOMA HIGHWAY PATROL
**Case Number (Agency Use):** 22-008568
**Motor Vehicles Involved:** 02 — **Number Injured:** 00 — **Number Killed:** 00

**(2) Date of Collision (mm/dd/yyyy):** 05/02/2022 — **Time:** 0220
**County Number and Name:** 41 LINCOLN
**Nearest City or Town Number and Name:** In ☐ Near ☒ 00 WELLSTON

**(3) Distance from Nearest City or Town Limits:** M☐ FT☐ N☐ S☐ 0002 MI☒ FT☐ W☒ E☐
**Control #:** 34 — **Int ID:** 00 — **Location:** 04 . 61 — **East Grid:** 007 . 4 — **North Grid:** 028 . 6 — **Administrative:** PARIS

**(4) Street, Road or Highway:** TURNER TURNPIKE (I-44) EB — **At:** — **Distance from:** 0004 MI☒ FT☐ N☐ S☐ E☒ W☐ **of (Nearest) Intersecting Street, Road or Highway:** MILE MARKER 156

**(5) Unit:** 01 — **Occupants:** 01 — **Type:** D — **Hit & Run:** ☐ — **CMV:** ☐
**Last Name:** RICHMOND — **First:** LANDON — **Middle:** STEELE — **Suffix:** — **Date of Birth (mm/dd/yyyy):** 08/29/2003 — **Sex:** M

**(6) Address:** 3201 W 13TH PL. — **City:** NORMAN — **State:** OK — **Zip:** 73072 — **Telephone:** (405)574-0112

**(7) Driver License Number:** T084264034 — **State:** OK — **Class:** D — **Endorsement(s):** — **Restriction(s):** — **Inj. Sev.:** 1 — **Type of Injury:** 0 — **Drv./Ped. Cond.:** 03 — **OP Use:** 01

**(8) Air Bag:** 2 — **Ejected:** 1 — **Extricated:** 1 — **Test:** 2 — **(% BAC):** 0.08 — **Transported by:** — **To Medical Facility:** — **License Plate Number:** BXK291 — **State:** OK — **Month:** 05 — **Year:** 2022

**(9) VIN:** 1N6AA07A24N511103 — **Vehicle Year:** 2004 — **Color:** SIL — **2nd Color:** 0 — **Make:** NISS — **Model:** TITI — **Veh. Conf.:** 04 — **Extent of Damage:** 4

**(10) Insurance Verification:** 1 — **Insurance Company Name:** — **Policy Number:** — **Insurance Telephone:**

**(11) Vehicle Removed by:** Driver ☐ CHANDLER TIRE — **Owner's Last Name:** Same as Driver ☒ — **First:** — **Middle:** — **Suffix:**

**(12) Owner's Address:** — **City:** — **State:** — **Zip:** — **Oversized Load:** 0 — **Towed Veh. Type:** 00 — Rolled ☐ Burned ☐ — Phone present ☒ Phone in use ☐

**(13) Citation Number:** N414805 — **Statute/Ordinance Number:** 47.11-902 — **Citation Number:** N414806 — **Statute/Ordinance Number:** 47.11-309

**(14) Unit:** 02 — **Occupants:** 29 — **Type:** C — **Hit & Run:** ☐ — **CMV:** ☒
**Last Name:** PARADISE — **First:** RAYMOND — **Middle:** CLARENCE — **Suffix:** — **Date of Birth (mm/dd/yyyy):** 06/02/1964 — **Sex:** M

**(15) Address:** 696 SPRINGFIELD DR — **City:** O FALLON — **State:** MO — **Zip:** 63366 — **Telephone:** (618)567-7132

**(16) Driver License Number:** 173A298003 — **State:** MO — **Class:** B — **Endorsement(s):** — **Restriction(s):** — **Inj. Sev.:** 1 — **Type of Injury:** 0 — **Drv./Ped. Cond.:** 01 — **OP Use:** 04

**(17) Air Bag:** 1 — **Ejected:** 1 — **Extricated:** 1 — **Test:** 5 — **(% BAC):** 0. — **Transported by:** — **To Medical Facility:** — **License Plate Number:** K001040 — **State:** TX — **Month:** 03 — **Year:** 2023

**(18) VIN:** 2PCG33493EC735510 — **Vehicle Year:** 2014 — **Color:** BLU — **2nd Color:** SIL — **Make:** PREO — **Model:** BUS — **Veh. Conf.:** 14 — **Extent of Damage:** 3

**(19) Insurance Verification:** 3 — **Insurance Company Name:** NATIONAL UNION FIRE INSRUANCE — **Policy Number:** 2127707000 — **Insurance Telephone:** (531)621-0130

**(20) Vehicle Removed by:** Driver ☒ — **Owner's Last Name:** Same as Driver ☐ — **First:** — **Middle:** — **Suffix:**

**(21) Owner's Address:** — **City:** — **State:** — **Zip:** — **Oversized Load:** 0 — **Towed Veh. Type:** 00 — Rolled ☐ Burned ☐ — Phone present ☒ Phone in use ☐

**(22) Citation Number:** — **Statute/Ordinance Number:** — **Citation Number:** — **Statute/Ordinance Number:**

**(23) Investigating Officer:** Kendric Davis — **Badge Number:** 319 — **Trp/Div. Assigned:** YB — **Trp/Div. Location:** YB — **Reviewer (Init.):** RL — **Reviewer Badge Number:** 127 — **Date of Report (mm/dd/yyyy):** 05/02/2022

| Unit Type | Injury Severity | Type of Injury | Driver/Pedestrian Condition | Occupant Protection (OP) In Use |
|---|---|---|---|---|
| O Driver / P Pedestrian / X Pedestrian / Conveyance / B Bicyclist | Z Other Cyclist / C Parked Car / A Animal / T Train | 0 N/A / 1 No Injury / 2 Possible / 3 Non-Incapacitating / 4 Incapacitating / 5 Fatal / 9 Unknown | 0 N/A / 1 Head / 2 Trunk-External / 3 Trunk-Internal / 4 Arms / 5 Legs / 9 Unknown | 00 Not Applicable / 01 Apparently Normal / 02 Drinking - Ability Impaired / 03 Odor of Alcohol Beverage / 04 Illegal Drugs / 05 Under the Influence / 06 Very Tired / 07 Sleepy / 08 Ill (Sick) / 09 Dizzy/Faint / 10 Emotional / 11 Other / 99 Unknown | 00 Not Applicable / 01 None Used / 02 Lap Belt Only / 03 Shoulder Belt Only / 04 Shoulder and Lap Belt / 05 Child Restraint Type Unknown / 06 Restraint Used - Type Unknown / 07 Helmet / 08 Child Restraint - Forward Facing / 09 Child Restraint - Rear Facing / 10 Booster Seat / 11 Other / 99 Unknown |
| Air Bag Deployed | Ejected | Extricated | Chemical Test | Extent of Damage | Insurance Verification | Oversized Load | Towed Vehicle Type |
| 0 Not Applicable / 1 Not Deployed / 2 Deployed - Front / 3 Deployed - Side / 4 Deployed - Other (knee, air belt, etc.) / 5 Deployed - Combination / 9 Deployment Unknown | 0 Not Applicable / 1 Not Ejected / 2 Ejected, Partially / 3 Ejected, Totally / 9 Unknown | 0 N/A / 1 No / 2 Yes | 0 N/A / 1 Blood / 2 Breath / 3 Blood/Breath / 4 Test Refused / 5 None Given / 6 Other | 0 N/A / 1 None / 2 Minor / 3 Functional / 4 Disabling / 6 Unknown | 0 N/A / 1 No / 2 Owner | 0 N/A / N Not Permitted / P Permitted | 00 N/A / 01 Boat Trailer / 02 House Trailer / 03 Farm Trailer / 04 Horse Trailer / 05 Another Vehicle / 06 Utility Trailer / 07 Homemade / 08 Box Trailer / 09 Stock Trailer / 10 Camping Trailer / 11 Combination / 12 Other / 99 Unknown |

**WARNING - STATE LAW** Use of contents for commercial solicitation is unlawful

DPS: 0192-01 REV 0107

GREYHOUND 000001
CARRIGAN APPX. 051

**(24) Unit** 02

| Injured ☐ | Passenger ☒ | Witness ☐ | Prop. Owner ☐ | Pos in Veh. 51 | Last Name PUNAY | First AMILCAR | Middle A | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

**(25) Address** (Same as Driver)

| Address 122 E ECKERSON | City SPRING VALLEY | State NY | Zip 10952 | Telephone (Use Area Code) 9 |

**(26)**

| Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

**(27) Unit** 02

| Injured ☐ | Passenger ☒ | Witness ☐ | Prop. Owner ☐ | Pos in Veh. 51 | Last Name ORTIZ | First GERARDO | Middle DEL | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

**(28) Address** (Same as Driver)

| Address OKLAHOMA CT | City OKLAHOMA CITY | State OK | Zip 73008 | Telephone (Use Area Code) 9 |

**(29)**

| Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

**(30) Unit** 02

| Injured ☐ | Passenger ☒ | Witness ☐ | Prop. Owner ☐ | Pos in Veh. 51 | Last Name TRACEY | First ZACKERY | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

**(31) Address** (Same as Driver)

| Address 1246 LEHIGH ST E | City EASTON | State PA | Zip 18042 | Telephone (Use Area Code) (484)591-1986 |

**(32)**

| Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

**(33) Unit** 02

| Injured ☐ | Passenger ☒ | Witness ☐ | Prop. Owner ☐ | Pos in Veh. 51 | Last Name ELLSOUT | First JEREMY | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

**(34) Address** (Same as Driver)

| Address 106 DORA | City SADAM | State KS | Zip 66002 | Telephone (Use Area Code) (530)282-7332 |

**(35)**

| Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

---

**Complete information below if this vehicle is being used for COMMERCE/BUSINESS and has a GVWR/GCWR IN EXCESS OF 10,000 LBS., or has a HAZMAT PLACARD, or is a BUS WITH SEATING FOR NINE OR MORE INCLUDING THE DRIVER**

**(36) Unit** | Carrier Name | Address

**(37) City** | State | Zip

GVWR / GCWR: 0 - 10K lbs. ☐ | 10,001 - 26K lbs. ☐ | 26K+ lbs. ☐ | Axle Qty. | Cargo Body

Vehicle Use: Interstate Commerce ☐ | Intrastate Commerce ☐ | Other Non-Commercial ☐ | Government ☐

**(38) U.S. DOT Number** OK | NASI Report Number | Placard Number | Haz. Mat. Class | Haz. Mat. Involved Yes ☐ No ☐ | Haz. Mat. Release Yes ☐ No ☐

**(39) Unit** 02 | Carrier Name BOLT BUS | Address 350 N ST PAUL ST

**(40) City** DALLAS | State TX | Zip 75201

GVWR ☒ / GCWR: 0 - 10K lbs. ☐ | 10,001 - 26K lbs. ☐ | 26K+ lbs. ☒ | Axle Qty. 03 | Cargo Body 02

Vehicle Use: Interstate Commerce ☒ | Intrastate Commerce ☐ | Other Non-Commercial ☐ | Government ☐

**(41) U.S. DOT Number** 44110 | NASI Report Number OK | Placard Number | Haz. Mat. Class | Haz. Mat. Involved Yes ☐ No ☒ | Haz. Mat. Release Yes ☐ No ☒

---

### Position in Vehicle

00. Not Applicable
18. Front Row - Other
28. Second Row - Other
38. Third Row - Other
48. Fourth Row - Other
60. Sleeper Section of Truck Cab

See manual for additional seating examples

### Vehicle Configuration

00. N/A
01. Passenger Veh.-2 Dr
02. Passenger Veh.-4 Dr
03. Passenger Veh. Conv.
04. Pickup
05. Single Unit Truck, 2 axles
06. Single Unit Truck, 3+ axles
07. School Bus
08. Truck/Trailer
09. Truck-Tractor (Bobtail)
10. Truck-Tractor/ Semi-Trailer
11. Truck-Tractor/ Double
12. Truck-Tractor/ Triple
13. Bus/Large Van 9-16 occupants including driver
14. Bus 16+ occupants including driver
15. Motorcycle
16. Motor Scooter/ Moped
17. Motor Home
18. Farm Machinery
19. ATV
20. SUV
21. Passenger Van
22. Truck more than 10,000 lbs., Cannot Classify
23. Van 10,000 lbs. or Less
24. Other
99. Unknown

### Cargo Body Type

00. N/A
01. Bus 9-15 seats
02. Bus 16+ seats
03. Van / Enclosed Box / Stock Trailer
04. Cargo Tank
05. Flatbed
06. Intermodal
07. Dump Truck/ Trailer
08. Concrete Mixer
09. Auto Transporter
10. Garbage/Refuse
11. Hopper (grain/ chips/gravel)
12. Pole Trailer
13. Log Trailer
14. Vehicle Towing Vehicle
15. Other
99. Unknown

DPS: 0192-02 REV 0107

GREYHOUND 000002
CARRIGAN APPX. 052

| | Unit | Total Lanes In Roadway | Legal Speed | Actions Prior to Collision | Pedestrian / Pedalcyclist Only Location at Time of Collision | Safety Equip. | Unit Number of Vehicle Striking |
|---|---|---|---|---|---|---|---|
| This unit will correspond to 'Unit 1' | 01 | 02 | 75 | | | | |
| This unit will correspond to 'Unit 2' | 02 | 00 | 75 | | | | |

Was the collision in or near a construction, maintenance or utility work zone? (If yes, complete this section)    Yes ☐    No ☒

**Type of Work Zone**
1 Lane Closure
2 Lane Shift/Crossover
3 Work on Shoulder or Median
4 Intermittent or Moving Work
9 Unknown

**Location of the Work Zone Collision**
1 Before the First Work Zone Warning Sign
2 Advance Warning Area
3 Transition Area
4 Activity Area
5 Termination Area
9 Unknown

Workers Present    Yes ☐    No ☐    Unknown ☐

**Light**  2
1 Daylight
2 Dark-Not Lighted
3 Dark-Lighted
4 Dawn
5 Dusk
6 Dark-Unknown Lighting
7 Other
9 Unknown

**Weather**  04
01 Clear
02 Fog/Smog/Smoke
03 Cloudy
04 Rain
05 Snow
06 Sleet/Hail (Freezing Rain/Drizzle)
07 Severe Crosswind
08 Blowing Snow
09 Blowing Sand, Soil, Dirt
10 Other
99 Unknown

**Locality**  5
1 Residential
2 Business
3 Industrial
4 School
5 Not Built-up
6 Mixed Use
7 Other
9 Unknown

**Type of Intersection**  0
0 Not an Intersection
2 Y-Intersection
3 T-Intersection
4 Four-Way Intersection
5 Five-Point or More
6 Intersection as Part of Interchange
7 Traffic Circle
8 Roundabout
9 Unknown

**Incident Type**  00
00 Not an Incident
51 Private Property
52 Deliberate Intent
53 Medical Condition
54 Legal Intervention
55 Suicide
57 Drowning
58 Other

**Location of First Harmful Event**  02
01 On Roadway
02 Shoulder
03 Median
04 Roadside
05 Gore
06 Separator
07 Parking Lane/Zone
08 Off Roadway, Location Unknown
09 Outside Right-of-Way
10 Other
99 Unknown

**What Vehicle Was Going to Do**    Unit 1 01    Unit 2 13
00 Not Applicable
01 Go Ahead
02 Turn Left
03 Turn Right
04 Make "U" Turn
05 Stop
06 Slow for Cause
07 Start from Park/Stop
08 Change Lanes
09 Overtake
10 Pass
11 Back
12 Remain Stopped
13 Remain Parked
14 Enter/Merge In Traffic
15 Negotiate a Curve
16 Park
17 Other
99 Unknown

**What Vehicle Did**    Unit 1 15    Unit 2 13
00 Not Applicable
01 Went Ahead
02 Turned Left
03 Turned Right
04 Entered "U" Turn
05 Stopped
06 Slowed
07 Started From Park/Stop
08 Entered Other Lane
09 Overtaking
10 Passing
11 Backed
12 Remained Stopped
13 Remained Parked
14 Entered/Merged
15 Departed Rdwy-Right
16 Departed Rdwy-Left
17 Swerved Right
18 Swerved Left
19 Parked
20 Other
99 Unknown

**Visibility Obscured by**    Unit 1 00    Unit 2 00
00 Not Applicable
01 Trees
02 Embankment
03 Building
04 Signs
05 Parked Vehicles
06 High Weeds
07 Fences
08 Shrubbery
09 Ice, Snow or Frost on Windows
10 Smoke
11 Fog
12 Dust
13 Rain
14 Sun
15 Other
99 Unknown

**Driver Distracted by**    Unit 1 0    Unit 2 0
0 Not Applicable/None
1 Electronic Communication Devices
2 Other Electronic Device
3 Other Inside Vehicle
4 Other Outside Vehicle
9 Unknown

**Underride/Override**    Unit 1    Unit 2
0 Not Applicable
1 No Underride or Override
2 Underride, Compartment Intrusion
3 Underride, No Compartment Intrusion
4 Underride, Compartment Intrusion Unknown
5 Override, Motor Vehicle in Transport
6 Override, Other Motor Vehicle
9 Unknown

**Traffic Control**    Unit 1 00    Unit 2 00
00 No Control
01 Stop Sign
02 Traffic Signal
03 Flashing Traffic Signal
04 School Zone Signs
05 Yield Sign
06 Warning Sign
07 Railroad Advance Warning Sign
08 Railroad Cross Bucks
09 Railroad Gates
10 Railroad Signal
11 No Passing Zone
12 Person (including flagger, law enforcement, crossing guard, etc.)
13 Abnormal Control
14 Other
99 Unknown

**Road Surface Conditions**    Unit 1 02    Unit 2 02
01 Dry
02 Wet
03 Ice/Frost
04 Snow
05 Mud, Dirt, Gravel
06 Slush
07 Water (standing, moving)
08 Sand
09 Oil
10 Other
99 Unknown

**Road Character**

Grade    Unit 1 1    Unit 2 1
1 Level
2 Hillcrest
3 Uphill
4 Downhill
5 Sag (bottom)

Road Alignment    Unit 1 1    Unit 2 1
1 Straight
2 Curve - Left
3 Curve - Right

Road Surface Type    Unit 1 2    Unit 2 2
1 Concrete
2 Asphalt
3 Gravel
4 Dirt
5 Brick
6 Other
9 Unknown

**Trafficway**    Unit 1 4    Unit 2 4
0 Not Applicable
1 One Way
2 Two-Way - Not Divided
3 Two-Way - Divided
4 Two-Way - Divided - Positive Median Barrier
5 Turn Lane
6 Ramp / Loop
7 Driveway
8 Alley / Parking Lot
9 Unknown

**Vehicle Removal**    Unit 1 1    Unit 2 4
0 Not Applicable
1 Towed Due to Vehicle Damage
2 Towed For Reasons Other Than Damage
3 Remained at Scene
4 Driven from Scene
9 Unknown

**Vehicle Condition**    Unit 1 01    Unit 2 01
00 Not Applicable
01 Apparently Normal
02 Brakes
03 Headlights
04 Steering
05 Tail Lights
06 Brake Lights
07 Tires/Wheels
08 Suspension
09 Signal lights
10 Windows
11 Truck Coupling/Trailer Hitch/Safety Chains
12 Mirrors    15 Other
13 Wipers    99 Unknown
14 Power Train

**Special Function of Vehicle**    Unit 1 00    Unit 2 04
00 Not Applicable
01 School Bus
02 Transit Bus
03 Intercity Bus
04 Charter Bus
05 Other Bus
06 Military
07 OHP
08 Other Police
09 Other Law Enforcement
10 Ambulance
11 Fire Truck
12 Public Owned Vehicle
13 Highway Equipment
14 Special Mobilized Machine
15 Other    99 Unknown

**Emergency Vehicle Responding to an Emergency**    Unit 1 0    Unit 2 0
0 N/A    2 No
1 Yes    9 Unknown

**Unsafe / Unlawful Contributing Factors**    Unit 1 80    Unit 2 98

**FAILED TO YIELD**
01 From Stop Sign
02 From Yield Sign
03 Private Drive
04 County Road at Through Highway
05 From Signal Light
06 From Alley
07 To Pedestrian
08 To Vehicle on Right
09 To Vehicle in Intersection
10 To Emergency Vehicles
12 Other

**FOLLOWED TOO CLOSELY**
13 Human Element
14 Traffic Condition
15 Weather Condition

**UNSAFE SPEED**
16 Driver's Ability (Aged)
17 Inexperienced Driver - Young
18 Exceeding Legal Limit
19 For Traffic Conditions
20 For Type of Roadway (Gravel, Dirt, etc.)
21 For Ice or Snow on Roadway
22 Rain or Wet Roadway
23 Wind
24 Other Weather Conditions
25 Vehicle Condition
26 View Obstruction
27 On Curve/Turn
28 Impeding Traffic
29 Other

**IMPROPER TURN**
30 From Wrong Lane
31 From Direct Course
32 Right
33 Left
34 Turn About/U-Turn
35 To Enter Private Drive
36 In Front of Oncoming Traffic
37 Other

**CHANGED LANES UNSAFELY**
39 STOPPED IN TRAFFIC LANE

**FAILED TO STOP**
40 For Stop Sign
41 For Traffic Signal
42 For School Bus
43 For Railroad Gates/Signal
44 For Officer/Flagman
45 At Sidewalk/Stopline
46 Other

**UNSAFE VEHICLE**
47 Brakes
48 Steering
49 Tires
50 Suspension
51 Headlights
52 Tail Lights
53 Stop Lights
54 Wheel
55 Exhaust System
56 Windshield Wipers
57 Other Mechanical Defects

**LEFT OF CENTER**
58 In Meeting
59 No Passing Zone (Unmarked)
60 Marked Zone
61 Other

**IMPROPER OVERTAKING**
62 In Marked Zone
63 On Hill/Curve
64 At Intersection
65 Without Sufficient Clearance
66 Other

**IMPROPER PARKING**
67 On Roadway
68 Where Prohibited
69 Other

**INATTENTION**
70 Distracted by Passenger in Vehicle
71 Other Distraction Inside Vehicle
72 Distraction From Outside Vehicle
73 Other

**WRONG WAY**
74 On One Way
75 On Exit Ramp
76 On Entrance Ramp
77 Other

**IMPROPER START FROM**
78 Parked Position
79 Other

80 ALCOHOL-DUI/DWI
81 DRUG-DUI

**OTHER IMPROPER ACT/ MOVEMENT**
82 Failed to Signal
83 Disregarded Warning Signal
84 Improper Use of Lane
85 Improper Backing
86 Apparently Sleepy
87 Failed to Secure Load
88 Other/Unknown

**UNKN./NO IMPROPER ACT**
89 Deer in Roadway
90 Animal in Roadway
91 Domestic Animal in Rdwy
92 Avoiding Other Vehicle
93 Avoiding Pedestrian
94 Object/Debris in Roadway
95 Defect in Roadway
96 Abnormal Traffic Control
97 Improper Bicyclist Action
98 NO IMPROPER ACTION BY DRIVER
99 PEDESTRIAN ACTION

40 Tires
50 Suspension
51 Headlights
52 Tail Lights
53 Stop Lights
54 Wheel
55 Exhaust System
56 Windshield Wipers
57 Other Mechanical Defects

**Point of First Contact on Vehicle**    Unit 1 01    Unit 2 07
**Most Damaged Area**    Unit 1 01    Unit 2 07
00 Not Applicable    14 Undercarriage
13 Top    99 Unknown

GREYHOUND 000003
CARRIGAN APPX. 053

| Latitude | | Longitude | | Railroad Crossing Number | Roadway Orientation | |
|---|---|---|---|---|---|---|
| 35.6754 | N | -97.0648 | W | | Unit Number 01 | N E S W E |

Unit Number 02 | N E S W E



I-44 EASTBOUND (TURNER TURNPIKE)

N

NOT TO SCALE

3 FT CONCRETE BARRIER

7 FT IMPROVED SHOULDER

24'

Unit 1

Unit 1

Unit 1

Unit 2

Unit 1

DITCH

11 FT IMPROVED SHOULDER



**COLLISION EVENTS**

| Unit | First Event | Second Event | Third Event | Fourth Event | Most Harmful Event | First Harmful Event for the Entire Collision |
|---|---|---|---|---|---|---|
| 01 | 17 | 35 | 57 | 00 | 35 | 17 |

| Unit | First Event | Second Event | Third Event | Fourth Event | Most Harmful Event | |
|---|---|---|---|---|---|---|
| 02 | 34 | 00 | 00 | 00 | 34 | |

00 Not Applicable
10 Overturn/Rollover
11 Fire/Explosion
12 Immersion
13 Jackknife
14 Cargo/Equipment Loss or Shift
15 Equipment Failure (Blown Tire, Brake Failure, etc.)
16 Separation of Units
17 Departed Road Right
18 Departed Road Left
19 Cross Median/Centerline
20 Downhill Runaway

21 Fell/Jumped From Motor Vehicle
22 Thrown Or Falling Object
23 Other Non-Collision
PERSON, MOTOR VEHICLE, OR NON-FIXED OBJECT:
30 Pedestrian
31 Pedal Cycle
32 Railway Vehicle (train, engine)
33 Animal
34 Motor Vehicle In Transport
35 Parked Motor Vehicle
36 Struck by Falling, Shifting Cargo or Anything Set In Motion by Motor Vehicle

37 Work Zone/Maintenance Equipment
38 Other Non-Fixed Object
FIXED OBJECT:
40 Barrier (Cable)
41 Barrier (Concrete)
42 Barrier (Other)
43 Fence Pole
44 Fence
45 Traffic Signal Support
46 Traffic Sign Support
47 Utility Pole/Light Support
48 Other Post/Pole/Support
49 Guardrail/Guardrail Face
50 Guardrail End
51 Culvert
52 Curb
53 Island
54 Sand Barrels
55 Impact Attenuator/ Crash Cushion

56 Pavement Drop-Off
57 Ditch
58 Embankment
59 Tree (Standing)
60 Dividing Strip
61 Retaining Wall
62 Bridge Abutment
63 Bridge Pier or Support
64 Bridge Rail
65 Bridge Post
66 Bridge Curb
67 Bridge Super Structure (Beams)
68 Bridge Overhead Structure
69 Delineator
70 Mailbox
71 Other Fixed Object
72 Other Highway Structure
73 Ground
99 Unknown

**Remarks**

UNIT 1 WAS TRAVELING EB ON I-44 (TURNER TURNPIKE). UNIT 2 WAS PARKED ON THE SHOULDER OF TURNER TURNPIKE EB. WHILE TRAVELING, UNIT 1 DEPARTED THE ROADWAY RIGHT AND COLLIDED WITH UNIT 2. AOI WAS APPROX. 2 FT S OF THE S EDGE OF TURNER TURNPIKE EB AND APPROX. .4 OF A MILE E OF MILE MARKER 156. UNIT 1 THEN CONTINUED E AND CAME TO REST IN A DITCH APPROX. 492 FT E AND APPROX. 86 FT S OF AOI 1.

THE DRIVER OF UNIT 1 STATED HE FELL ASLEEP BEHIND THE WHEEL, WHICH CAUSED HIM TO DEPART THE ROADWAY AND LOSE CONTROL OF HIS VEHICLE. IT WAS LATER DETERMINED THAT THE DRIVER OF UNIT 1 WAS DRIVING UNDER THE INFLUENCE OF ALCOHOL AND PLACED UNDER ARREST.

This report is based on the officer's investigation of this collision. This report may contain the opinion of the officer.



DPS: 0192-04 REV 0107

GREYHOUND 000004
CARRIGAN APPX. 054

| (42) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name HARTUNA | First CARL | Middle U | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (43) Address Same as Driver 11 HARVEY PL | City ENDEAVOUR HILLS | State 98 | Zip | Telephone (Use Area Code) 6268904954 |

| (44) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (45) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name ESHWENDER | First CHARLES | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (46) Address Same as Driver 341 2ND ST 187 | City LAWTON | State OK | Zip 73571 | Telephone (Use Area Code) 5807300321 |

| (47) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (48) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name CAMP | First TIMOTHY | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (49) Address Same as Driver 4424 ROCHE ST | City COLLEGE PARK | State GA | Zip 30349 | Telephone (Use Area Code) 7708635002 |

| (50) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (51) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name REOD | First DARCEL | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (52) Address Same as Driver 8023 S 51ST DR | City LAVEEN | State AZ | Zip 85339 | Telephone (Use Area Code) 4806402627 |

| (53) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (54) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name RATCLIFF | First MATTHEW | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (55) Address Same as Driver 901 W CANADIAN AVE | City VINITA | State OK | Zip 74301 | Telephone (Use Area Code) 7402020499 |

| (56) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (57) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name MCKELVEY | First BEVERLY | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (58) Address Same as Driver 1576 JACKSON RD | City LUFKIN | State TX | Zip 75904 | Telephone (Use Area Code) 9366751964 |

| (59) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (60) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name LORENZO | First ELIZABETH | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex F |

| (61) Address Same as Driver 7730 E BROADWAY BLVD | City TUCSON | State AZ | Zip 85710 | Telephone (Use Area Code) 6828043036 |

| (62) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (63) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name OTERO | First NATHAN | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |

| (64) Address Same as Driver 12831 DORADO DR | City ALBUQUERQUE | State NM | Zip 87123 | Telephone (Use Area Code) 5055078866 |

| (65) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (66) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name OVERSTREET | First RENEE | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex F |

| (67) Address Same as Driver 11719 E 21ST CT D | City TULSA | State OK | Zip 74132 | Telephone (Use Area Code) 9199944308 |

| (68) Injury Severity / Type 1 / 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

DPS: 0192-SUPP01 REV 0107

GREYHOUND 000005
CARRIGAN APPX. 055

**(42) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: VACA — First: BIUS — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: F

**(43) Address** Same as Driver: NUEVA YORK — City: NUEVA YORK — State: 98 — Zip: — Telephone (Use Area Code): 0989004806

**(44) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(45) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: FERNANDEZ — First: MARTHEN — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: M

**(46) Address** Same as Driver: NEUVA YORK — City: NEUVA YORK — State: 98 — Zip: — Telephone (Use Area Code): 0989004806

**(47) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(48) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: CHILLO — First: PATRICIO — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: F

**(49) Address** Same as Driver: NEUVA YORK — City: NEUVA YORK — State: 98 — Zip: — Telephone (Use Area Code): 0988685047

**(50) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(51) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: RONDELL — First: SCOTTIE — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: M

**(52) Address** Same as Driver: UNKNOWN — City: — State: 99 — Zip: — Telephone (Use Area Code): 9

**(53) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(54) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: SHARP — First: CRAIG — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: M

**(55) Address** Same as Driver: P O BOX 154 — City: IROQUOIS — State: IL — Zip: 60945 — Telephone (Use Area Code): 2175790231

**(56) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(57) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: HAWKINS — First: KRISTIN — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: M

**(58) Address** Same as Driver: 13100 PANDORA DR — City: DALLAS — State: TX — Zip: 75238 — Telephone (Use Area Code): 6822468603

**(59) Injury Severity / Type** 1 — 0 — OP Use: 03 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(60) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: STRONG — First: LYNA — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: F

**(61) Address** Same as Driver: 521 BORDAN — City: ELLENWOOD — State: GA — Zip: 30294 — Telephone (Use Area Code): 4045202756

**(62) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(63) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: GINDER — First: BRANDON — Middle: MICHAEL — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: M

**(64) Address** Same as Driver: 524 LEE DR — City: UNKNOWN — State: 99 — Zip: — Telephone (Use Area Code): 9312108556

**(65) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

**(66) Unit** 02 — Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ — Pos In Veh. 51 — Last Name: HENRY — First: MONIQUE — Middle: — Suffix: — DOB(mm/dd/yyyy): 01/01/0001 — Sex: F

**(67) Address** Same as Driver: UNKNOWN — City: — State: 99 — Zip: — Telephone (Use Area Code): 9187032134

**(68) Injury Severity / Type** 1 — 0 — OP Use: 02 — Air Bag: 1 — Ejected: 1 — Extricated: 1 — Transported by: — To Medical Facility: — Property Type:

GREYHOUND 000006
CARRIGAN APPX. 056

| (42) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name CULVER | First DANIEL | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |
| (43) Same as Driver Address UNKNOWN | | | | City | State 99 | Zip | Telephone (Use Area Code) 4154104755 |
| (44) Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (45) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name NAVOCELLO | First JENNIFER | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex F |
| (46) Same as Driver Address UNKNOWN | | | | City | State 99 | Zip | Telephone (Use Area Code) 8315152860 |
| (47) Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (48) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name OVERSTREET | First NATASHA | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex 9 |
| (49) Same as Driver Address 6347 E NEWTON | | | | City TULSA | State OK | Zip 74115 | Telephone (Use Area Code) 9189828122 |
| (50) Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (51) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name CLARK | First JOELLE | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |
| (52) Same as Driver Address UNKNOWN | | | | City | State 99 | Zip | Telephone (Use Area Code) 9 |
| (53) Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (54) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 11 | Last Name CLARK | First LILLY | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex F |
| (55) Same as Driver Address UNKNOWN | | | | City | State 99 | Zip | Telephone (Use Area Code) 9 |
| (56) Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (57) Unit 02 | Injured ☐ Passenger ☒ Witness ☐ Prop. Owner ☐ | Pos in Veh. 51 | Last Name YAZZIE | First DYLAN | Middle | Suffix | DOB(mm/dd/yyyy) 01/01/0001 | Sex M |
| (58) Same as Driver Address 220 W BELL RD | | | | City PHOENIX | State AZ | Zip 85023 | Telephone (Use Area Code) 4802443167 |
| (59) Injury Severity / Type 1 | 0 | OP Use 02 | Air Bag 1 | Ejected 1 | Extricated 1 | Transported by | To Medical Facility | Property Type |

| (60) Unit | Injured ☐ Passenger ☐ Witness ☐ Prop. Owner ☐ | Pos in Veh. | Last Name | First | Middle | Suffix | DOB(mm/dd/yyyy) | Sex |
| (61) Same as Driver Address | | | | City | State | Zip | Telephone (Use Area Code) |
| (62) Injury Severity / Type | | OP Use | Air Bag | Ejected | Extricated | Transported by | To Medical Facility | Property Type |

| (63) Unit | Injured ☐ Passenger ☐ Witness ☐ Prop. Owner ☐ | Pos in Veh. | Last Name | First | Middle | Suffix | DOB(mm/dd/yyyy) | Sex |
| (64) Same as Driver Address | | | | City | State | Zip | Telephone (Use Area Code) |
| (65) Injury Severity / Type | | OP Use | Air Bag | Ejected | Extricated | Transported by | To Medical Facility | Property Type |

| (66) Unit | Injured ☐ Passenger ☐ Witness ☐ Prop. Owner ☐ | Pos in Veh. | Last Name | First | Middle | Suffix | DOB(mm/dd/yyyy) | Sex |
| (67) Same as Driver Address | | | | City | State | Zip | Telephone (Use Area Code) |
| (68) Injury Severity / Type | | OP Use | Air Bag | Ejected | Extricated | Transported by | To Medical Facility | Property Type |

DPS: 0192-SUPP01 REV 0107

GREYHOUND 000007
CARRIGAN APPX. 057